**LEGAL STATUS**

This site displays a prototype of a "Web 2.0" version of the daily Federal Register. It is not an official legal edition of the Federal Register, and does not replace the official print version or the official electronic version on GPO's govinfo.gov.

The documents posted on this site are XML renditions of published Federal Register documents. Each document posted on the site includes a link to the corresponding official PDF file on govinfo.gov. This prototype edition of the daily Federal Register on FederalRegister.gov will remain an unofficial informational resource until the Administrative Committee of the Federal Register (ACFR) issues a regulation granting it official legal status. For complete information about, and access to, our official publications and services, go to About the Federal Register on NARA's archives.gov.

The OFR/GPO partnership is committed to presenting accurate and reliable regulatory information on FederalRegister.gov with the objective of establishing the XML-based Federal Register as an ACFR-sanctioned publication in the future. While every effort has been made to ensure that the material on FederalRegister.gov is accurately displayed, consistent with the official SGML-based PDF version on govinfo.gov, those relying on it for legal research should verify their results against an official edition of the Federal Register. Until the ACFR grants it official status, the XML rendition of the daily Federal Register on FederalRegister.gov does not provide legal notice to the public or judicial notice to the courts.

**LEGAL STATUS**

# American Rescue Plan Act Elementary and Secondary School Emergency Relief Fund

A Rule by the Education Department on 04/22/2021

## DOCUMENT DETAILS

**Printed version:**
PDF (https://www.govinfo.gov/content/pkg/FR-2021-04-22/pdf/2021-08359.pdf)

**Publication Date:**
04/22/2021 (/documents/2021/04/22)

**Agency:**
Department of Education (https://www.federalregister.gov/agencies/education-department)

**Dates:**
Effective date: These interim final requirements are effective April 22, 2021.

**Effective Date:**
04/22/2021

**Document Type:**
Rule

**Document Citation:**
86 FR 21195

**Page:**
21195-21207 (13 pages)

**CFR:**
34 CFR chapter undef

**Agency/Docket Number:**
Docket ID ED-2021-OESE-0061

**RIN:**
1810-AB64

**Document Number:**
2021-08359

---

**DOCUMENT DETAILS**

---

**DOCUMENT STATISTICS**

**Page views:**
21,015
as of 08/30/2021 at 6:15 pm EDT

---

**DOCUMENT STATISTICS**

---

**ENHANCED CONTENT**



**Docket Number:**
ED-2021-OESE-0061 (https://beta.regulations.gov/docket/ED-2021-OESE-0061)

**Docket Name:**
American Rescue Plan Act Elementary and Secondary School Emergency Relief Fund

**Docket RIN**
1810-AB64

**Supporting/Related Materials:**
American Rescue Plan Act Elementary and Secondary School... (https://www.regulations.gov/document?D=ED-2021-OESE-0061-0001)

---

**ENHANCED CONTENT**

---

**PUBLISHED DOCUMENT**

## AGENCY:

Office of Elementary and Secondary Education, Department of Education.

## ACTION:

Interim final requirements.

## SUMMARY:

The Department of Education ("Department") establishes interim final requirements for the American Rescue Plan Elementary and Secondary School Emergency Relief ("ARP ESSER") Fund, under section 2001 of the American Rescue Plan ("ARP") Act of 2021. These requirements are intended to promote accountability, transparency, and the effective use of funds by: Ensuring that each State educational agency ("SEA") meaningfully engages in stakeholder consultation and takes public input into account in the development of its ARP ESSER plan; ensuring that each local educational agency ("LEA") develops a plan for the use of its ARP ESSER funds and engages in meaningful consultation and seeks public input as it develops the LEA ARP ESSER plan; and clarifying how an LEA must meet the statutory requirement to develop a plan for the safe return to in-person instruction and continuity of services.

## DATES:

*Effective date:* These interim final requirements are effective April 22, 2021.

*Comment due date:* We must receive your comments on or before May 24, 2021.

## ADDRESSES:

Submit your comments through the Federal eRulemaking Portal or by postal mail, commercial delivery, or hand delivery. We will not accept comments submitted by fax or by email or those submitted after the comment period. To ensure that we do not receive duplicate copies, please submit your comments only once. In addition, please include the Docket ID at the top of your comments.

If you are submitting comments electronically, we strongly encourage you to submit any comments or attachments in Microsoft Word format. If you must submit a comment in Adobe Portable Document Format (PDF), we strongly encourage you to convert the PDF to print-to-PDF format or to use some other commonly used searchable text format. Please do not submit the PDF in a scanned format. Using a print-to-PDF format allows the Department to electronically search and copy certain portions of your submissions.

- *Federal eRulemaking Portal:* Go to *www.regulations.gov (http://www.regulations.gov)* to submit your comments electronically. Information on using *regulations.gov*, including instructions for accessing agency documents, submitting comments, and viewing the docket, is available on the site under "FAQ."
- *Postal Mail, Commercial Delivery, or Hand Delivery:* The Department strongly encourages commenters to submit their comments electronically. However, if you mail or deliver your comments about the interim final requirements, address them to: Britt Jung, U.S. Department of Education, 400 Maryland Avenue SW, Room 3W113, Washington, DC 20202.

## Privacy Note:

The Department's policy is to make comments received from members of the public available for public viewing on the Federal eRulemaking Portal at *www.regulations.gov (http://www.regulations.gov)*. Therefore, commenters should include in their comments only information that they wish to make publicly available.

## FOR FURTHER INFORMATION CONTACT:

Britt Jung, U.S. Department of Education, 400 Maryland Avenue SW, Room 3W113, Washington, DC 20202. Telephone: (202) 453-5563. Email: *ESSERF@ed.gov (mailto:ESSERF@ed.gov).*

If you use a telecommunications device for the deaf ("TDD") or a text telephone ("TTY"), call the Federal Relay Service ("FRS"), toll free, at 1-800-877-8339.

## SUPPLEMENTARY INFORMATION:

*Invitation to Comment:* Although the Department has decided to issue these interim final requirements without first publishing proposed requirements for public comment, we are interested in whether you think we should make any changes in these requirements. We invite your comments. We will consider these comments in determining whether to revise the requirements.

To ensure that your comments may be most effectively considered, we urge you to clearly identify the specific section or sections of the interim final requirements that each comment addresses and to arrange your comments in the same order as the interim final requirements.

We invite you to assist us in complying with the specific requirements of Executive Orders 12866 and 13563 and their overall requirement of reducing regulatory burden that might result from these interim final requirements. Please let us know of any further ways by which we could reduce potential costs or increase

Case 2:21-cv-04024-MSG Document 2-7 Filed 09/08/21 Page 4 of 29

potential benefits while preserving the effective and efficient administration of the Department's programs and activities.

During and after the comment period, you may inspect all public comments about these interim final requirements by accessing *www.regulations.gov (http://www.regulations.gov)*. Due to the current COVID-19 public health emergency, the Department buildings are not open to the public. However, upon reopening, you may also inspect the comments in person at 400 Maryland Avenue SW, Washington, DC 20202, between 8:30 a.m. and 4:00 p.m., Eastern Time, Monday through Friday of each week except Federal holidays. To schedule a time to inspect comments, please contact the person ⬚ listed under **FOR FURTHER INFORMATION CONTACT**.

⬚ Start Printed Page 21196

*Assistance to Individuals with Disabilities in Reviewing the Rulemaking Record:* On request, we will provide an appropriate accommodation or auxiliary aid to an individual with a disability who needs assistance to review the comments or other documents in the public rulemaking record for these interim final requirements. To schedule an appointment for this type of accommodation or auxiliary aid, please contact the person listed under **FOR FURTHER INFORMATION CONTACT**.

*Purpose of Program:* The ARP ESSER Fund provides a total of nearly $122 billion to SEAs and LEAs to help safely reopen and sustain the safe operation of schools and address the impacts of the coronavirus disease 2019 ("COVID-19") pandemic on the Nation's students by addressing students' academic, social, emotional, and mental health needs.

*Program Authority:* The American Rescue Plan Act of 2021, Public Law 117-2 (https://www.govinfo.gov/link/plaw/117/public/2?link-type=html), March 11, 2021.

*Background:* In early 2020, COVID-19 swept through the world, resulting in major upheaval to all aspects of life. In the United States, this resulted in unprecedented school closures in the spring of 2020. For tens of millions of students, learning was abruptly interrupted. For many students who were already facing limited educational opportunities and disengagement—including students from low-income families, students of color, English learners, children with disabilities, students experiencing homelessness, children in foster care, migratory students, children who are incarcerated, and other underserved students—losing access to reliable in-person instruction and the many supports schools can provide has led to significant challenges.

Since spring of 2020, the opportunities for students to learn have varied significantly across the country. Some schools have remained fully virtual and still have not physically reopened, while others have been providing in-person instruction for months. Many schools are providing a hybrid approach, with virtual instruction for a portion of the school week, and in-person instruction for the remainder of the week. As the initial 2021 National Assessment of Educational Progress ("NAEP") School Survey revealed, there are significant disparities in both access to and enrollment in in-person instruction across the country, with white students much more likely than students of color to be learning in person as of February.[1] Many of the most disadvantaged students have frequently encountered barriers to accessing virtual learning.[2] Students across virtual and in-person settings are facing significant academic, social, emotional, and mental health challenges as a result of the interrupted education and the trauma caused by the COVID-19 pandemic.

In recognition of the immense challenges facing students, educators, staff, schools, LEAs, and SEAs right now, Congress has made emergency funds available to SEAs and LEAs to prevent, prepare for, and respond to COVID-19, first through the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, Public Law 116-136 (https://www.govinfo.gov/link/plaw/116/public/136?link-type=html), div. B, tit. VIII, section

18003, enacted on March 27, 2020; next through the Coronavirus Response and Relief Supplemental Appropriations (CRRSA) Act, 2021, Public Law 116-260 (https://www.govinfo.gov/link/plaw/116/public/260?link-type=html), section 313, enacted on December 27, 2020; and, most recently and significantly, through the ARP Act, Public Law 117-2 (https://www.govinfo.gov/link/plaw/117/public/2?link-type=html), section 2001, enacted on March 11, 2021.

The ARP Act provides a total of nearly $122 billion via the ARP ESSER Fund to SEAs and LEAs to help schools return safely to in-person instruction, maximize in-person instructional time, sustain the safe operation of schools, and address the academic, social, emotional, and mental health impacts of the COVID-19 pandemic on the Nation's students. ARP ESSER provides funds to each SEA in the same proportion as each State received under part A of title I of the Elementary and Secondary Education Act of 1965 ("ESEA") in fiscal year 2020.[3] An SEA must allocate at least 90 percent of its ARP ESSER grant funds to its LEAs (including charter schools that are LEAs) in the State in the same proportion that the LEAs received under part A of title I of the ESEA in fiscal year 2020.[4] Each SEA is required to reserve at least 5 percent of its total ARP ESSER funds to carry out activities to address the academic impact of lost instructional time; [5] at least 1 percent for the implementation of evidence-based summer enrichment programs; and at least 1 percent for the implementation of evidence-based comprehensive afterschool programs.[6] Each of these reservations requires that the SEA use evidence-based interventions that respond to the academic, social, emotional, and mental health needs of students, particularly groups of students disproportionately impacted by the pandemic.[7] The SEA may reserve no more than half of 1 percent of its total ARP ESSER allocation for administrative costs.[8] The SEA may use any remaining funds for emergency needs as determined by the SEA to address issues responding to COVID-19.[9]

An LEA may use its ARP ESSER funds for a wide variety of activities related to educating students during the COVID-19 pandemic and addressing the impacts of the COVID-19 pandemic on students and educators. For example, an LEA may use the ARP ESSER funds to maintain the health and safety of students and school staff as they return to in-person instruction (*e.g.,* adopting policies consistent with guidance on reopening schools from the Centers for Disease Control and Prevention ("CDC"), available at *https://www.cdc.gov/ coronavirus/2019-ncov/community/schools-childcare/operation-strategy.html (https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/operation-strategy.html),* including universal and correct wearing of masks; modifying facilities to allow for physical distancing (*e.g.,* use of cohorts/podding); handwashing and respiratory etiquette; cleaning and maintaining healthy facilities, including improving ventilation; contact tracing in combination with isolation and quarantine, in collaboration with the State, local, territorial, or Tribal health departments; diagnostic and screening testing; efforts to provide vaccinations to school communities; appropriate accommodations for children with disabilities with respect to health and safety policies; and coordination with State and local health officials). The Department released related resources to assist schools in safely reopening for in-person learning as part of the ED COVID-19 Handbook. Volume 1 of the ED COVID-19 Handbook is available at *https://www2.ed.gov/documents/coronavirus/reopening.pdf (https://www2.ed.gov/documents/coronavirus/reopening.pdf).* Most ⬚ recently, the Department released Volume 2 of the ED COVID-19 Handbook to assist schools in addressing critical student needs. Volume 2 of the ED COVID-19 Handbook is available at *https://www2.ed.gov/documents/coronavirus/reopening-2.pdf (https://www2.ed.gov/documents/coronavirus/reopening-2.pdf).*

⬚ Start Printed Page 21197

An LEA may also use the ARP ESSER funds to address the academic, social, emotional, and mental health needs of its students by, for example, hiring additional personnel such as school counselors, psychologists, and nurses and implementing strategies to accelerate learning and to make investments in teaching and learning that will result in lasting improvements in the LEA. An LEA may also use the funds for activities that are necessary to maintain the operation of services in LEAs, for example, to stabilize the workforce and avoid layoffs. In December 2020, the Bureau of Labor Statistics reported an 8.6 percent decline in the local government education workforce over the previous 12 months, to its smallest size for the same month since 1999.[10]

In addition to the wide range of allowable uses of ARP ESSER funds, an LEA that receives ARP ESSER funds must reserve at least 20 percent of the funds to measure and address the academic impact of lost instructional time on all students, through the implementation of evidence-based interventions, such as interventions implemented through summer learning or summer enrichment, extended day, comprehensive afterschool programs, or extended school year programs. The LEA must also ensure that such interventions respond to students' academic, social, emotional, and mental health needs and address the impact of the COVID-19 pandemic on groups of students disproportionately impacted by the pandemic.[11]

On March 24, 2021, the Department made available two thirds of each SEA's ARP ESSER allocation to support ongoing efforts to reopen schools safely for in-person learning, keep schools safely open once students are back, and address the academic, social, emotional, and mental health needs of all students. To receive the remaining third of an SEA's ARP ESSER allocation and to comply with the terms and conditions of the ARP ESSER funds the SEA has already received, the Department is requiring that the SEA develop and submit an ARP ESSER plan that describes, among other things, the current education needs within the State, the SEA's intended uses of ARP ESSER funds, and the plans for supporting LEAs in their planning for and use of ARP ESSER funds.

As described in more detail below, the Secretary is establishing interim final requirements for ARP ESSER related to SEA consultation, LEA ARP ESSER plans, and the statutory requirement that LEAs receiving ARP ESSER funds develop plans for the safe return to in-person instruction and continuity of services.

*SEA Consultation with Stakeholders; Public Input Statute:* Under 20 U.S.C. 1231 (https://www.govinfo.gov/link/uscode/20/1231?type=usc&year=mostrecent&link-type=html)g, unless otherwise limited by law, the Secretary is authorized to require the submission of applications for assistance under any applicable program. "Applicable program" is defined in 20 U.S.C. 1221 (https://www.govinfo.gov/link/uscode/20/1221?type=usc&year=mostrecent&link-type=html)(c)(1) as any program for which the Department has administrative responsibility, which includes ARP ESSER. Title VIII of Division B of the CARES Act directs the Department to carry out the Education Stabilization Fund, of which the ARP ESSER funds are a part. Section 2001 of the ARP Act provides for the Department to make grants to each SEA from the ARP ESSER funds. Under 20 U.S.C. 1221 (https://www.govinfo.gov/link/uscode/20/1221?type=usc&year=mostrecent&link-type=html)e-3, the Secretary has the authority to promulgate rules governing the programs administered by the Department.

*Interim Final Requirement:* Under this requirement, an SEA must engage in meaningful consultation with various stakeholder groups on its ARP ESSER plan and give the public an opportunity to provide input on the development of the plan and take such input into account.Specifically, an SEA is required to consult with students; families; Tribes (if applicable); civil rights organizations (including disability rights organizations); school and district administrators (including special education administrators); superintendents; charter school leaders (if applicable); teachers, principals, school leaders, other educators, school staff, and their

unions; and stakeholders representing the interests of children with disabilities, English learners, children experiencing homelessness, children in foster care, migratory students, children who are incarcerated, and other underserved students in the development of its ARP ESSER plan. Under the requirement, an SEA must also provide the public with the opportunity to provide input in the development of the plan and take such input into account.

To facilitate consultation on an SEA's ARP ESSER plan and ongoing communication with the public, under the requirement, an SEA must also make information publicly available on its website as soon as possible but no later than June 21, 2021, and regularly provide updated available information on its website, on the numbers of schools in the State providing each mode of instruction (*i.e.,* fully remote or online-only instruction, both remote/online instruction and in-person instruction (hybrid model), and full-time in-person instruction). The SEA must also make publicly available student enrollment data and, to the extent available, student attendance data for all students and disaggregated by students from low-income families, students from each racial and ethnic group, gender, English learners, children with disabilities, children experiencing homelessness, children in foster care, and migratory students for each mode of instruction.

*Reasons:* As explained in the background text above, the ARP ESSER program provides significant resources to SEAs and LEAs to respond to the educational disruptions caused by the COVID-19 pandemic. Given the unprecedented funding available and the widespread impacts of the COVID-19 pandemic, ARP ESSER funding presents a unique opportunity not only to help students and educators overcome the trauma and the loss of instructional time that they may have experienced, but also to make investments in student achievement and success. With strategic investment, ARP ESSER funding can build the capacity of States, LEAs, and schools to sustain meaningful and effective teaching and learning and address the needs of underserved students. Taking full advantage of this opportunity is consistent with the President's determination to "build back better" in response to the COVID-19 pandemic.

We believe diverse stakeholders will have significant insight into the effects of the COVID-19 pandemic on teaching and learning that will be critical to informing an SEA's plan for ARP ESSER, including how it will use its ARP ESSER funds, support LEAs in the use of their ARP ESSER funds, and evaluate the effectiveness of ARP ESSER. For that reason, under the requirement, an SEA must engage with students; families; Tribes (if applicable); civil rights organizations (including disability rights organizations); school and district administrators (including special education administrators); superintendents; charter school leaders (if applicable); teachers, principals, 🗋 school leaders, other educators, school staff, and their unions; and stakeholders representing the interests of children with disabilities, English learners, children experiencing homelessness, children in foster care, migratory students, children who are incarcerated, and other underserved students in the development of the SEA's ARP ESSER plan. The SEA must also provide the general public with the opportunity to provide input (*e.g.,* by requesting input on its website) and must take the public input it receives into account. By seeking input from these diverse stakeholders and the general public, an SEA will be better positioned to fully understand and adequately respond to the education needs in the State and the impact of the COVID-19 pandemic on all students, and particularly the groups of students most significantly impacted by the COVID-19 pandemic. The SEA will also be better positioned to make critical investments not just to recover, but also to implement and improve effective approaches for teaching and learning that accelerate student learning outcomes and address the needs of underserved students most impacted by the COVID-19 pandemic.

🗋 Start Printed Page 21198

The requirement that the SEA make information publicly available on its website about the number of schools offering fully remote or online-only instruction, both remote/online instruction and in-person instruction (hybrid), and full-time in-person instruction is an important initial step toward transparency and

understanding of the continued impact of the pandemic on learning and teaching. Disaggregated enrollment and, if available, attendance data will allow the public to provide more informed input on the SEA's ARP ESSER plan and initial approaches for targeting of federal resources to address the impact of interrupted instruction and the needs of students and teachers.

## LEA ARP ESSER Plans

*Statute:* Title VIII of Division B of the CARES Act directs the Department to carry out the Education Stabilization Fund, of which the ARP ESSER funds are a part. Section 2001 of the ARP Act provides for the Department to make grants to each SEA from the ARP ESSER funds. An SEA must allocate at least 90 percent of its ARP ESSER grant funds to its LEAs (including charter schools that are LEAs) in the State in the same proportion that the LEAs received under part A of title I of the ESEA in Fiscal Year 2020, as required by section 2001(d)(1) of the ARP Act; and section 2001(e) of the ARP Act prescribes certain mandatory and permissive uses of LEAs' funds. Under 20 U.S.C. 1221 (https://www.govinfo.gov/link/uscode/20/1221? type=usc&year=mostrecent&link-type=html)e-3, the Secretary has the authority to promulgate rules governing the programs administered by the Department.

*Interim Final Requirement:* Under this requirement, each LEA that receives ARP ESSER funds must develop, submit to the SEA on a reasonable timeline determined by the SEA, and make publicly available on the LEA's website, a plan for the LEA's use of ARP ESSER funds. The plan, and any revisions to the plan submitted consistent with procedures established by the SEA, must include at a minimum a description of—

(1) The extent to which and how the funds will be used to implement prevention and mitigation strategies that are, to the greatest extent practicable, consistent with the most recent CDC guidance on reopening schools, in order to continuously and safely open and operate schools for in-person learning;

(2) How the LEA will use the funds it reserves under section 2001(e)(1) of the ARP Act to address the academic impact of lost instructional time through the implementation of evidence-based interventions, such as summer learning or summer enrichment, extended day, comprehensive afterschool programs, or extended school year;

(3) How the LEA will spend its remaining ARP ESSER funds consistent with section 2001(e)(2) of the ARP Act; and

(4) How the LEA will ensure that the interventions it implements, including but not limited to the interventions implemented under section 2001(e)(1) of the ARP Act to address the academic impact of lost instructional time, will respond to the academic, social, emotional, and mental health needs of all students, and particularly those students disproportionately impacted by the COVID-19 pandemic, including students from low-income families, students of color, English learners, children with disabilities, students experiencing homelessness, children in foster care, and migratory students.

Under this requirement, an LEA must engage in meaningful consultation with stakeholders and give the public an opportunity to provide input in the development of its plan. Specifically, an LEA must engage in meaningful consultation with students; families; school and district administrators (including special education administrators); and teachers, principals, school leaders, other educators, school staff, and their unions. Additionally, an LEA must engage in meaningful consultation with each of the following, to the extent present in or served by the LEA: Tribes; civil rights organizations (including disability rights

organizations); and stakeholders representing the interests of children with disabilities, English learners, children experiencing homelessness, children in foster care, migratory students, children who are incarcerated, and other underserved students.

Finally, under the requirement, each LEA's ARP ESSER plan must be: In an understandable and uniform format; to the extent practicable, written in a language that parents can understand or, if not practicable, orally translated; and, upon request by a parent who is an individual with a disability, provided in an alternative format accessible to that parent.

*Reasons:*

*LEA ARP ESSER Plan—*

Under the ARP ESSER program, LEAs are receiving significant resources to respond to student and educator needs as schools continue to safely reopen. LEA plans are necessary to ensure transparency and accountability for use of the funds. As discussed in more detail below, the public and in particular students, their families, and educators, have a vested interest in understanding an LEA's priorities and plans for the funds and whether and how the LEA will use the funds to address their students' academic, social, emotional, and mental health needs. Requiring the development and posting of the LEA's plan will result in important transparency.

Additionally, ARP ESSER provides significant federal resources to respond to the COVID-19 pandemic that, for some LEAs, comprise millions of dollars of emergency funding. Requiring each LEA to develop a plan for the use of those funds will provide a mechanism for SEAs and the Department to ensure that the ARP ESSER funds are being used consistent with statutory requirements and to meet the needs of schools, students, and educators, in particular those students most impacted by the COVID-19 pandemic.

The minimum requirements for the ARP ESSER plans ensure that LEAs are using ARP ESSER funds for their intended purposes, including whether and how they will use the funds specifically for COVID-19 prevention and mitigation strategies, how the funds will be used to address the academic impact of lost instructional time through the implementation of evidence-based interventions, consistent with the requirement in section 2001(e)(1) of the ARP Act that each LEA reserve at least 20 percent of its ARP ESSER funds for that purpose, and how the LEA will ensure that those interventions respond ⬜ to the academic, social, emotional, and mental health needs of all students and particularly those students disproportionately impacted by the COVID-19 pandemic. Given the unique circumstances in each State, we believe each SEA is best situated to determine what additional requirements to include in the LEA ARP ESSER plan. For example, an SEA might require that the LEA ARP ESSER plan include data that illustrates the LEA's most pressing needs or descriptions of promising practices that the LEA has implemented to accelerate learning. The SEA might also require that the LEA's ARP ESSER plan contain the information required in the LEA's plan for the safe return to in-person instruction and continuity of services, in which case the LEA may develop one plan that addresses both sets of requirements rather than two separate plans (*i.e.,* one plan that addresses use of ARP ESSER funds and the safe return to in-person instruction and continuity of services). The SEA also establishes the deadline by which the LEA must submit its ARP ESSER plan, which must be reasonable and should be within no later than 90 days after receiving its ARP ESSER allocation.

⬜ Start Printed Page 21199

## LEA ARP ESSER Plan Meaningful Consultation

COVID-19 has had a dramatic impact on the Nation's education system. In addition to disrupting teaching and learning, it has exacerbated existing inequities in our schools and school districts. Every aspect of student life has been impacted by the COVID-19 pandemic: Students' classes and courses of study have been interrupted and/or delayed and students' social, emotional, and mental health have been negatively impacted by the isolation and anxiety of living through a pandemic and quarantine along with the additional associated stresses placed on their families.[12]

As students and teachers continue to return to full-time in-person education, they will have important insights into how schools should approach prevention and mitigation of COVID-19, and into what may be needed to support student success. For this reason, in developing their ARP ESSER plans, LEAs will be required to meaningfully consult with students; families; school and district administrators (including special education administrators); and teachers, principals, school leaders, other educators, school staff, and their unions. Additionally, an LEA is also required to engage in meaningful consultation with each of the following, to the extent present in or served by the LEA: Tribes; civil rights organizations (including disability rights organizations); and stakeholders representing the interests of children with disabilities, English learners, children experiencing homelessness, children in foster care, migratory students, children who are incarcerated, and other underserved students. An LEA's decisions about how to use its ARP ESSER funds will directly impact the students, families, and stakeholders in their school district, and thus the LEA's plans must be tailored to the specific needs faced by students and schools within the district. These diverse stakeholders will have significant insight into what prevention and mitigation strategies should be pursued to keep students and staff safe, as well as how the various COVID-19 prevention and mitigation strategies impact teaching, learning, and day-to-day school experiences.

With regard to addressing the academic, social, emotional, and mental health needs of all students, particularly those most impacted by the pandemic, we believe that it is critical that LEAs solicit and consider the input of students and their families to identify their most pressing needs. Close coordination with Tribes is critical to effective support for Native American students, so LEAs need to consult Tribes, as applicable. In addition, the Department understands educators and students' families will have important insights into and observations of students' academic, social, emotional, and mental health needs garnered from their experiences during the COVID-19 pandemic. Stakeholders will similarly have critical insights into how best to address the academic impact of lost instructional time that LEAs are required to address with at least 20 percent of their ARP ESSER funds. For all of these reasons, through this consultation, LEAs will be better positioned to fully plan to use ARP ESSER funds to adequately respond to the needs of all students, particularly those most impacted by the COVID-19 pandemic.

## LEA ARP ESSER Plan Accessibility

The requirement also mandates that LEA ARP ESSER plans be accessible, including to parents with limited English proficiency and individuals with a disability. This requirement is intended to help ensure that all parents, including parents with limited English proficiency or individuals with disabilities, are able to access and understand the information in an LEA's ARP ESSER plan, consistent with the Department's interpretation of Title VI of the Civil Rights Act of 1964 and existing obligations to parents with disabilities under the Americans with Disabilities Act (ADA).

## LEA Plan for Safe Return to In-Person Instruction and Continuity of Services

*Statute:* Section 2001(i)(1) of the ARP Act requires each LEA that receives ARP ESSER funds to develop and make publicly available on the LEA's website, not later than 30 days after receiving ARP ESSER funds, a plan for the safe return to in-person instruction and continuity of services for all schools, including those that

have already returned to in-person instruction. Section 2001(i)(2) of the ARP Act further requires that the LEA seek public comment on the plan and take those comments into account in the development of the plan. Finally, section 2001(i)(3) of the ARP Act states that an LEA that developed a plan for the safe return to in-person instruction and continuity of services prior to the date of enactment of the ARP Act will be deemed to have met the requirement to develop a plan under section 2001(i)(1) as long as the plan meets the statutory requirements (*i.e.,* is publicly available on the LEA's website and was developed after the LEA sought and took into account public comment).

*Interim Final Requirement:* As described in more detail below, this requirement clarifies what an LEA's plan for the safe return to in-person instruction and continuity of services must address and requires periodic review and, when needed, revision of the plan to ensure it remains relevant and meets statutory and regulatory requirements.□

□ Start Printed Page 21200

First, the requirement clarifies that an LEA's plan must include how it will maintain the health and safety of students, educators, and other school and LEA staff, and the extent to which it has adopted policies, and a description of any such policies, on each of the CDC's safety recommendations including: Universal and correct wearing of masks; modifying facilities to allow for physical distancing (*e.g.,* use of cohorts/podding); handwashing and respiratory etiquette; cleaning and maintaining healthy facilities, including improving ventilation; contact tracing in combination with isolation and quarantine, in collaboration with the State, local, territorial, or Tribal health departments; diagnostic and screening testing; efforts to provide vaccinations to school communities; appropriate accommodations for children with disabilities with respect to health and safety policies; and coordination with State and local health officials.

Second, the requirement further clarifies that the plan must describe how the LEA will ensure continuity of services, including but not limited to services to address students' academic needs and students' and staff social, emotional, mental health and other needs, which may include student health and food services.

Third, the requirement provides that, during the period of the ARP ESSER award established in section 2001(a) of the ARP Act (*i.e.,* until September 30, 2023),[13] an LEA must periodically, but no less frequently than every six months, review and, as appropriate, revise its plan. Consistent with section 2001(i)(2) of the ARP Act, which requires an LEA to seek public comment on the development of its plan, an LEA must seek public input and take such input into account in determining whether to revise its plan and, if it determines revisions are necessary, on the revisions it makes to its plan, *i.e.,* the LEA must seek public input on whether to revise its plan and on any revisions to its plan no less frequently than every six months (taking into consideration the timing of significant changes to CDC guidance on reopening schools). The requirement clarifies that, if the LEA revises its plan, the revised plan must address each of the aspects of safety currently recommended by the CDC or, if the CDC has updated its safety recommendations at the time the LEA is revising its plan, each of the updated safety recommendations. The requirement also clarifies that an LEA that developed a plan prior to enactment of the ARP Act that meets the requirements under section 2001(i) (1) and (2) of the ARP Act but does not address each of the required aspects of safety established in this requirement must, as part of the required periodic review, revise its plan consistent with these requirements no later than six months after it last reviewed its plan.

Fourth, under the requirement, the plans must be: In an understandable and uniform format; to the extent practicable, written in a language that parents can understand or, if not practicable, orally translated; and upon request by a parent who is an individual with a disability, provided in an alternative format accessible to that parent.

*Reasons:* The statutory requirements for each LEA to develop a plan for the safe return to in-person instruction and continuity of services, to seek and incorporate public comment on the plan, and to make the plan publicly available are important for planning and transparency as LEAs work to return to, or continue, the safe operation of in-person instruction. However, the statute does not explicitly define what it means for a plan to provide for a safe return to and continuity of in-person instruction.

Because safe return to and continuity of in-person instruction is fundamental to addressing the lost instructional time and disengagement that many students have experienced during the COVID-19 pandemic, it is essential that these plans contain precise information about how LEAs will focus on prevention and mitigation of COVID-19 specific to their communities, in order to keep students, staff, and families healthy and to avoid future shutdowns. To ensure that each plan contains a sufficient level of specificity, the requirement sets forth several aspects of safety that each LEA plan must address.[14] These elements are consistent with current, relevant guidance from the CDC related to the safe reopening of schools.[15] The requirement does not mandate that an LEA adopt the CDC guidance, but only requires that the LEA describe in its plan the extent to which it has adopted the key prevention and mitigation strategies identified in the guidance. The requirement also ensures that each plan will specifically address how it will continue to provide services that meet student and staff needs. Section 2001(i) of the ARP Act requires that the plan address "continuity of services," but does not specifically identify those services. The requirement clarifies that, in addition to meeting academic needs, the plan must also address how the LEA will continue to provide services to meet students' academic needs and students' and staff social, emotional, mental health, and other needs through, for example, continuing to provide students meals and access to medical services. According to the National School Lunch Program, before COVID-19, schools provided free or reduced-priced lunches to approximately 22 million students each day.[16] This is just one example of the many essential services that schools provide. For this reason, the requirement ensures that each LEA separately addresses continuity of services as a discrete prong of the plan.

The statute does not explicitly specify when or how often an LEA's plan must be reviewed and revised. To help an LEA adapt to the constantly evolving status of the COVID-19 pandemic, the requirement mandates that, during the period of the grant, an LEA review its plan at least every six months (taking into consideration the timing of significant changes to CDC guidance on reopening schools), and seek public input in determining whether, and what, revisions are necessary. The requirements also make clear that a revised plan must continue to address safety recommendations from the CDC, which must include updated CDC guidance, to ensure that the plans continue to provide useful information that addresses the most up-to-date research on COVID-19 prevention and mitigation. This requirement will also ensure that an LEA that developed a safe return to in-person instruction and continuity of services plan prior to enactment of the ARP Act and the requirement will, at least within six months of receipt of its grant, revise, as ⬜ necessary, and post its plan so that it addresses all of the safety recommendations included in the requirement.

⬜ Start Printed Page 21201

The rationale for requiring that LEA plans for the safe return to in-person instruction and continuity of services be accessible, including to parents with limited English proficiency and individuals with disabilities, is described above with respect to the same requirement as it applies to LEA ARP ESSER plans.

*Interim Final Requirements:* The Secretary establishes the following interim final requirements for the ARP ESSER Fund.

(1) *SEA Consultation with Stakeholders; Public Input.* An SEA receiving ARP ESSER funds must, in the development of its ARP ESSER plan—

(a) Engage in meaningful consultation with stakeholders, including, but not limited to, students; families; Tribes (if applicable); civil rights organizations (including disability rights organizations); school and district administrators (including special education administrators); superintendents; charter school leaders (if applicable); teachers, principals, school leaders, other educators, school staff, and their unions; and stakeholders representing the interests of children with disabilities, English learners, children experiencing homelessness, children in foster care, migratory students, children who are incarcerated, and other underserved students;

(b) Provide the public the opportunity to provide input and take such input into account; and

(c) To facilitate consultation on its ARP ESSER plan and ongoing communication with the public, make information publicly available on its website as soon as possible but no later than June 21, 2021, and regularly provide updated available information on its website, on—

(i) The numbers of schools in the State providing each mode of instruction (*i.e.,* fully remote or online-only instruction, both remote/online instruction and in-person instruction (hybrid model), and full-time in-person instruction); and

(ii) Student enrollment data and, to the extent available, student attendance data for all students and disaggregated by students from low-income families, students from each racial and ethnic group, gender, English learners, children with disabilities, children experiencing homelessness, children in foster care, and migratory students for each mode of instruction listed in paragraph (i).

(2) *LEA ARP ESSER Plan.*

(a) Each LEA that receives ARP ESSER funds must submit to the SEA, in such manner and within a reasonable timeline as determined by the SEA, a plan that contains any information reasonably required by the SEA. The plan, and any revisions to the plan submitted consistent with procedures established by the SEA, must describe—

(i) The extent to which and how the funds will be used to implement prevention and mitigation strategies that are, to the greatest extent practicable, consistent with the most recent CDC guidance on reopening schools, in order to continuously and safely open and operate schools for in-person learning;

(ii) How the LEA will use the funds it reserves under section 2001(e)(1) of the ARP Act to address the academic impact of lost instructional time [17] through the implementation of evidence-based interventions, such as summer learning or summer enrichment, extended day, comprehensive afterschool programs, or extended school year programs;

(iii) How the LEA will spend its remaining ARP ESSER funds consistent with section 2001(e) of the ARP Act; and

(iv) How the LEA will ensure that the interventions it implements,including but not limited to the interventions under section 2001(e)(1) of the ARP Act to address the academic impact of lost instructional time, will respond to the academic, social, emotional, and mental health needs of all students, and particularly those students disproportionately impacted by the COVID-19 pandemic, including students from low-income families, students of color, English learners, children with disabilities, students experiencing homelessness, children in foster care, and migratory students.

Case 2:21-cv-04024-MSG Document 21-7 Filed 09/08/21 Page 14 of 29

(b) In developing its ARP ESSER plan, an LEA must—

(i) Engage in meaningful consultation—

(A) With stakeholders, including: Students; families; school and district administrators (including special education administrators); and teachers, principals, school leaders, other educators, school staff, and their unions; and

(B) To the extent present in or served by the LEA: Tribes; civil rights organizations (including disability rights organizations); and stakeholders representing the interests of children with disabilities, English learners, children experiencing homelessness, children in foster care, migratory students, children who are incarcerated, and other underserved students; and

(ii) Provide the public the opportunity to provide input and take such input into account.

(c) An LEA's ARP ESSER plan must be—

(i) In an understandable and uniform format;

(ii) To the extent practicable, written in a language that parents can understand or, if it is not practicable to provide written translations to a parent with limited English proficiency, be orally translated for such parent;

(iii) Upon request by a parent who is an individual with a disability as defined by the ADA, provided in an alternative format accessible to that parent; and

(iv) Be made publicly available on the LEA's website.

(3) *LEA Plan for Safe Return to In-Person Instruction and Continuity of Services*.

(a) An LEA must describe in its plan under section 2001(i)(1) of the ARP Act for the safe return to in-person instruction and continuity of services—

(i) how it will maintain the health and safety of students, educators, and other staff and the extent to which it has adopted policies, and a description of any such policies, on each of the following safety recommendations established by the CDC:

(A) Universal and correct wearing of masks.

(B) Modifying facilities to allow for physical distancing (*e.g.,* use of cohorts/podding).

(C) Handwashing and respiratory etiquette.

(D) Cleaning and maintaining healthy facilities, including improving ventilation.

(E) Contact tracing in combination with isolation and quarantine, in collaboration with the State, local, territorial, or Tribal health departments.

(F) Diagnostic and screening testing.

(G) Efforts to provide vaccinations to school communities.

(H) Appropriate accommodations for children with disabilities with respect to health and safety policies.

(I) Coordination with State and local health officials.

(ii) how it will ensure continuity of services, including but not limited to services to address students' academic needs and students' and staff social, emotional, mental health, and other needs, which may include student health and food services.

(b)(i) During the period of the ARP ESSER award established in section ☐ 2001(a) of the ARP Act, an LEA must regularly, but no less frequently than every six months (taking into consideration the timing of significant changes to CDC guidance on reopening schools), review and, as appropriate, revise its plan for the safe return to in-person instruction and continuity of services.

☐ Start Printed Page 21202

(ii) In determining whether revisions are necessary, and in making any revisions, the LEA must seek public input and take such input into account.

(iii) If at the time the LEA revises its plan the CDC has updated its guidance on reopening schools, the revised plan must address the extent to which the LEA has adopted policies, and describe any such policies, for each of the updated safety recommendations.

(c) If an LEA developed a plan prior to enactment of the ARP Act that meets the statutory requirements of section 2001(i)(1) and (2) of the ARP Act but does not address all the requirements in paragraph (a), the LEA must, pursuant to paragraph (b), revise and post its plan no later than six months after receiving its ARP ESSER funds to meet the requirements in paragraph (a).

(d) An LEA's plan under section 2001(i)(1) of the ARP Act for the safe return to in-person instruction and continuity of services must be—

(i) In an understandable and uniform format;

(ii) To the extent practicable, written in a language that parents can understand or, if it is not practicable to provide written translations to a parent with limited English proficiency, be orally translated for such parent; and

(iii) Upon request by a parent who is an individual with a disability as defined by the ADA, provided in an alternative format accessible to that parent.

## Waiver of Notice and Comment Rulemaking and Delayed Effective Date

Under the Administrative Procedure Act ("APA") (5 U.S.C. 551 (https://www.govinfo.gov/link/uscode/5/551?type=usc&year=mostrecent&link-type=html)-559), the Department generally offers interested parties notice of and the opportunity to comment on proposed requirements. However, the APA provides that an agency is not required to conduct notice and comment rulemaking "when the agency for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. 553 (https://www.govinfo.gov/link/uscode/5/553?type=usc&year=mostrecent&link-type=html)(b)(B). Here, there is good cause to waive notice and comment rulemaking. The requirements in this notice are critical to

ensuring that SEAs and LEAs urgently and effectively develop plans to use the ARP ESSER resources that reflect a full understanding of student needs and support a strong response to those needs. In addition, to ensure an effective and sustained return to in-person instruction, it is imperative that LEA return to in-person instruction plans address specific areas of safety and are adjusted as needed in response to evolving COVID-19 pandemic circumstances. However, going through the full rulemaking process would delay an SEA's ability to submit a plan for its remaining ARP ESSER funds, which are emergency funds intended to meet the immediate needs of students, educators, staff, schools, LEAs, and SEAs. Notice and comment rulemaking would be contrary to the public interest because the time involved would preclude emergency funds being available to meet exigent need for summer learning and effective, timely planning for the upcoming school year, both of which are critical to mitigate and prevent the continued impact of lost instructional time as well as to meet academic, social, and emotional needs. Nonetheless, the Department is issuing interim final requirements instead of final requirements to allow the members of the public to provide their input about the content of the requirements.

The COVID-19 pandemic continues to present extraordinary circumstances, including widespread school closures, significant loss of instructional time, and trauma for students, educators, and other staff. Various provisions of section 2001 of the ARP Act describe the emergency caused by the COVID-19 pandemic and encourage quick dispersal of ARP ESSER funds. Establishing these interim final requirements now, without the delay of notice and comment rulemaking, enables SEAs and LEAs to effectively use ARP ESSER funds to address the immediate safety, academic, social, and emotional needs of students and help schools safely return to or continue in-person instruction.

The APA also requires that regulations be published at least 30 days before their effective date, unless the agency has good cause to implement its regulations sooner (5 U.S.C. 553 (https://www.govinfo.gov/link/uscode/5/553?type=usc&year=mostrecent&link-type=html)(d)(3)). Again, because the ARP ESSER funds are needed to address the immediate needs of students, educators, schools, LEAs, and SEAs due to the COVID-19 pandemic, the Secretary also has good cause to waive the 30-day delay in the effective date of these requirements under 5 U.S.C. 553 (https://www.govinfo.gov/link/uscode/5/553?type=usc&year=mostrecent&link-type=html)(d)(3).

## Executive Orders 12866 and 13563

### Regulatory Impact Analysis

Under Executive Order 12866, the Office of Management and Budget ("OMB") must determine whether this regulatory action is "significant" and, therefore, subject to the requirements of the Executive order and subject to review by OMB. Section 3(f) of Executive Order 12866 defines a significant regulatory action as an action likely to result in a rule that may—

(1) Have an annual effect on the economy of $100 million or more, or adversely affect a sector of the economy; productivity; competition; jobs; the environment; public health or safety; or State, local, or Tribal governments or communities in a material way (also referred to as "economically significant" regulations);

(2) Create a serious inconsistency or otherwise interfere with an action taken or planned by another agency;

(3) Materially alter the budgetary impacts of entitlements, grants, user fees, or loan programs or the rights and obligations of recipients thereof; or

(4) Raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles stated in the Executive order.

This regulatory action is an economically significant regulatory action subject to review by OMB under section 3(f) of Executive Order 12866.

Pursuant to section 804(2) of the Congressional Review Act (5 U.S.C. 804 (https://www.govinfo.gov/link/uscode/5/804?type=usc&year=mostrecent&link-type=html)(2)), the Office of Information and Regulatory Affairs designated this rule as a "major rule."

We have also reviewed these regulations under Executive Order 13563, (/executive-order/13563) which supplements and explicitly reaffirms the principles, structures, and definitions governing regulatory review established in Executive Order 12866. To the extent permitted by law, section 1(b) of Executive Order 13563 (/executive-order/13563) requires that an agency—

(1) Propose or adopt regulations only upon a reasoned determination that their benefits justify their costs (recognizing that some benefits and costs are difficult to quantify);

(2) Tailor its regulations to impose the least burden on society, consistent with obtaining regulatory objectives taking into account, among other things, and to the extent practicable, the costs of cumulative regulations;

(3) Select, in choosing among alternative regulatory approaches, those approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages; distributive impacts; and equity);

(4) To the extent feasible, specify performance objectives, rather than the behavior or manner of compliance a regulated entity must adopt; and

Start Printed Page 21203

(5) Identify and assess available alternatives to direct regulation, including providing economic incentives— such as user fees or marketable permits—to encourage the desired behavior, or providing information that enables the public to make choices.

Executive Order 13563 (/executive-order/13563) also requires an agency "to use the best available techniques to quantify anticipated present and future benefits and costs as accurately as possible." [18] The Office of Information and Regulatory Affairs of OMB has emphasized that these techniques may include "identifying changing future compliance costs that might result from technological innovation or anticipated behavioral changes." [19]

The Department has assessed the potential costs and benefits, both quantitative and qualitative, of this regulatory action, and we are issuing these interim final requirements only on a reasoned determination that their benefits justify their costs. In choosing among alternative regulatory approaches, we selected those approaches that would maximize net benefits. Based on the analysis that follows and the reasons stated elsewhere in this document, the Department believes that the interim final requirements are consistent with the principles set forth in Executive Order 13563 (/executive-order/13563).

We also have determined that this regulatory action does not unduly interfere with State, local, or Tribal governments in the exercise of their governmental functions.

In this regulatory impact analysis, we discuss the need for regulatory action, the potential costs and benefits, and the net budget impacts.

Elsewhere, under *Paperwork Reduction Act of 1995*, we identify and explain burdens specifically associated with information collection requirements.

## Need for Regulatory Action and Analysis of Benefits

These interim final requirements are intended to provide two critical benefits: State and local plans under the ARP ESSER program that are informed by and meaningfully address the academic, social, emotional, and mental health needs of our Nation's students, particularly those students disproportionately impacted by the COVID-19 pandemic; and local plans required under the ARP Act that effectively guide a safe return to in-person instruction and ensure continuity of services during and after the COVID-19 pandemic. As discussed elsewhere in this document, the ARP ESSER program provides significant resources to SEAs and LEAs to respond to the unprecedented educational disruptions caused by the COVID-19 pandemic. The Department believes this regulatory action is needed to ensure that the plans SEAs and LEAs develop to use these resources reflect a full understanding of student needs and support a strong, urgent response to these pressing needs. In addition, to ensure an effective and sustained return to in-person instruction, it is imperative that LEA plans address specific areas of safety and adjust as needed in response to evolving COVID-19 pandemic circumstances.

## Analysis of Costs

This regulatory action establishes interim final requirements for an SEA to meaningfully consult with various stakeholder groups on its ARP ESSER plan, give the public an opportunity to provide input on the development of the plan, and facilitate consultation and public input by publishing and regularly updating information on school modes of instruction and student enrollment and, to the extent available, attendance. It also requires an LEA receiving ARP ESSER funds to develop and make publicly available a plan for the use of those funds; meaningfully consult with stakeholders and consider public input in developing its plan; and make its plan accessible, including to parents with limited English proficiency and individuals with disabilities. Finally, with respect to the LEA plan for the safe return to in-person instruction and continuity of services required under section 2001(i) of the ARP Act, this action specifies what the plan must address; requires periodic review and, when needed, revision of the plan, with consideration of public input in each case, to ensure it meets statutory and regulatory requirements and remains relevant to the needs of schools; and requires that the plan be accessible, including to parents with limited English proficiency and individuals with disabilities. We estimate the costs of complying with these interim final requirements in the paragraphs that follow. Throughout, we use mean wages for Education and Childcare Administrators [20] to monetize costs associated with SEA and LEA staff time, and we assume that the total dollar value of labor, including overhead and benefits, is equal to 200 percent of the wage rate.

SEAs and LEAs may use ARP ESSER funds to defray costs associated with these interim final requirements, including funds that an SEA reserves for administration under section 2001(f)(4) of the ARP Act.

## SEA Consultation With Stakeholders; Public Input

The Department expects that SEAs generally will rely on previously established procedures for consulting with stakeholders and considering public input and that any burden in adapting those procedures to comply with these interim final requirements for ARP ESSER plans would be negligible. We estimate that, in implementing its procedures, an SEA will need, on average, 80 staff-hours to engage in meaningful consultation with identified stakeholder groups and 40 staff-hours to consider public input, for a total

estimated average of 120 staff-hours. At $97.28 per SEA staff-hour, the average estimated cost to comply with the requirements is approximately $12,000. For 52 SEAs (including the District of Columbia and the Commonwealth of Puerto Rico), the total estimated cost is $607,000.

Under the interim final requirements, an SEA must facilitate consultation with stakeholders and ongoing communication with the public by posting on its website information on the number of schools in the State providing different modes of instruction and on student enrollment and (if available) attendance, and it must update such information regularly. We expect that SEAs generally possess much of this information and estimate that the average SEA will need 100 hours to comply with the facilitation requirement, including initial posting and six updates. At $97.28 per SEA staff-hour, the average estimated cost to comply with the requirements is approximately $9,700. For 52 SEAs, the total estimated cost is $505,900.

## LEA ARP ESSER Plans

Under the interim final requirements, an LEA must develop an ARP ESSER plan that describes, at a minimum, how the LEA will use ARP ESSER funds to implement prevention and mitigation strategies in school opening and operations, address the academic impact ⬜ of lost instructional time, carry out other allowable activities, and identify and meet student needs resulting from the COVID-19 pandemic. The Department expects that the majority of LEAs have already devoted significant time and resources toward identifying activities that are responsive to these requirements and that, for these LEAs, the burden associated with ARP ESSER plan development would consist primarily in determining how best to use ARP ESSER funds for these purposes. We estimate that an LEA will need, on average, 40 staff-hours (exclusive of time to consult with stakeholders and consider public input, which is estimated in the following paragraph) to develop an ARP ESSER plan that meets the requirements and to make its plan publicly available. At $97.28 per LEA staff-hour, the average estimated cost to comply with the ARP ESSER plan development requirement is approximately $3,900. For an estimated 15,000 LEAs receiving ARP ESSER funds, the total estimated cost is $58,368,000.

⬜ Start Printed
Page 21204

We anticipate that, as with SEAs, LEAs receiving ARP ESSER funds largely will use existing processes for stakeholder consultation and public input and that any adaptations of those processes for purposes of the final requirement would impose minimal burden. The Department estimates that, in carrying out its process, an LEA will need, on average, 30 staff-hours to engage in meaningful consultation with identified stakeholder groups and consider public input. At $97.28 per LEA staff-hour, the average estimated cost to comply with the requirement is approximately $2,900. For an estimated 15,000 LEAs receiving ARP ESSER funds, the total estimated cost for stakeholder consultation and public input is $43,776,000.

Finally, we estimate that an LEA will need an average of 10 hours to comply with the requirement that its ARP ESSER plan be accessible, including to parents with limited English proficiency and individuals with disabilities. At $97.28 per LEA staff-hour, the average estimated cost to comply with the requirement is approximately $1,000. For an estimated 15,000 LEAs receiving ARP ESSER funds, the total estimated cost is $14,592,000.

## LEA Plan for Safe Return to In-Person Instruction and Continuity of Services

The Department believes that the majority of LEAs developed plans for the safe return to in-person instruction and continuity of services prior to enactment of the ARP Act. We estimate that one-third of LEAs receiving ARP ESSER funds, or an estimated 5,000 LEAs, will need to develop or revise such plans to meet

statutory and regulatory requirements, using an average of 40 staff-hours. At $97.28 per LEA staff-hour, the average estimated cost for complying with the requirements is approximately $3,900, and the total estimated cost is $19,456,000.

Under these interim final requirements, an LEA must review its plan at least every six months, revise its plan as needed, and consider public input in plan review and revision. Assuming LEAs implement their plans through Fiscal Year 2023, an LEA will need to review its plan a minimum of five times—more specifically, at least once in Fiscal Year 2021 and twice in each of Fiscal Years 2022 and 2023—to meet the plan review requirement. We estimate that each review, including consideration of public input using customary methods, will require an average of 10 staff-hours, for a total average of 50 staff-hours. Further, we estimate that the average LEA will revise its plan once and require an average of 20 staff-hours for plan revision, including consideration of public input. The total average estimated staff-hours for complying with plan review and revision requirements is 70 staff-hours, and at $97.28 per LEA staff-hour, the average estimated cost is approximately $6,800. For an estimated 15,000 LEAs receiving ARP ESSER funds, the total estimated cost for complying with the plan review and revision requirements is $102,144,000.

Finally, we estimate that an LEA will need an average of 15 hours to comply with the requirement that its plan (including revisions) for the safe return to in-person instruction and continuity of services be accessible, including to parents with limited English proficiency and individuals with disabilities. At $97.28 per LEA staff-hour, the average estimated cost to comply with the requirement is approximately $1,500. For an estimated 15,000 LEAs receiving ARP ESSER funds, the total estimated cost is $21,888,000.

## Net Budget Impacts

We estimate that the discretionary elements of these interim final requirements will not have an impact on the Federal budget. This regulatory action establishes requirements for SEAs and LEAs receiving ARP ESSER funds but does not affect the amount of funding available for this program. We anticipate that the nearly $122 billion in ARP ESSER funds will be disbursed in Fiscal Year 2021, and therefore estimate $122 billion in transfers in Fiscal Year 2021 relative to a pre-statutory baseline.

## Accounting Statement

Accounting Statement: Classification of Estimated Impacts

[In millions]

| Category | Benefits |
|---|---|
| SEA and LEA ARP ESSER plans that are informed by and successfully address student needs | Not Quantified |
| LEA plans that ensure a safe return to in-person instruction and continuity of services | Not Quantified |
| | Costs |
| SEA consultation with stakeholders; public input | $1.1 |
| LEA plan for use of ARP ESSER funds | $117 |
| LEA plan for safe return to in-person instruction and continuity of services | $143 |
| | Transfers |
| Activities to help safely reopen and sustain the safe operation of schools and address the impact of the coronavirus pandemic on the Nation's students | $121,975 |

## Regulatory Flexibility Act Certification

The Regulatory Flexibility Act does not apply to this rulemaking because there is good cause to waive notice-and-comment rulemaking under the Administrative Procedure Act (5 U.S.C. 553 (https://www.govinfo.gov/link/uscode/5/553?type=usc&year=mostrecent&link-type=html)).

## Clarity of the Regulations

Executive Order 12866 and the Presidential Memorandum "Plain Language in Government Writing" require each agency to write regulations that are easy to understand.

The Secretary invites comments on how to make these regulations easier to understand, including answers to questions such as the following:

- Are the requirements in the interim final requirements clearly stated?
- Do the interim final requirements contain technical terms or other wording that interferes with their clarity?
- Does the format of the interim final requirements (grouping and order of sections, use of headings, paragraphing, etc.) aid or reduce their clarity?
- Would the interim final requirements be easier to understand if we divided them into more (but shorter) sections?
- Could the description of the interim final requirements in the **SUPPLEMENTARY INFORMATION** section of this preamble be more helpful in making the requirements easier to understand? If so, how?
- What else could we do to make the interim final requirements easier to understand?

To send any comments that concern how the Department could make these interim final requirements easier to understand, see the instructions in the **ADDRESSES** section.

## Paperwork Reduction Act of 1995

As part of its continuing effort to reduce paperwork and respondent burden, the Department provides the general public and Federal agencies with an opportunity to comment on proposed and continuing collections of information in accordance with the Paperwork Reduction Act of 1995 ("PRA") (44 U.S.C. 3501 (https://www.govinfo.gov/link/uscode/44/3501?type=usc&year=mostrecent&link-type=html) *et seq.*). This helps ensure that the public understands the Department's collection instructions, respondents provide the requested data in the desired format, reporting burden (time and financial resources) is minimized, collection instruments are clearly understood, and the Department can properly assess the impact of collection requirements on respondents.

A Federal agency may not conduct or sponsor a collection of information unless OMB approves the collection under the PRA and the corresponding information collection instrument displays a currently valid OMB control number. Notwithstanding any other provision of the law, no person is required to comply with, or is subject to penalty for failure to comply with, a collection of information if the collection instrument does not display a currently-valid OMB control number.

As discussed in the *Analysis of Costs and Benefits* section of the *Regulatory Impact Statement*, this regulatory action establishes interim final requirements for an SEA to meaningfully consult with various stakeholder groups on its ARP ESSER plan and to give the public an opportunity to provide input on the development of the plan. It also requires an LEA receiving ARP ESSER funds to develop and make publicly

available a plan for the use of those funds; meaningfully consult with stakeholders and consider public input in developing its plan; and make its plan accessible, including to parents with limited English proficiency and parents with a disability. Finally, with respect to the LEA plan for the safe return to in-person instruction and continuity of services required under section 2001(i) of the ARP Act, this action specifies what the plan must address; requires periodic review and, when needed, revision of the plan, with consideration of public input in each case, to ensure it meets statutory and regulatory requirements and remains relevant to the needs of schools; and requires that the plan be accessible, including to parents with limited English proficiency and parents with disabilities. We estimate the costs and burden hours associated with complying with these interim final requirements in the paragraphs that follow. The estimates below for the costs and burden hours are the same as the costs and staff-hours discussed in the *Regulatory Impact Statement* unless otherwise noted. Differences between the estimates in the *Regulatory Impact Statement* and this section are due to differences in calculating the net impact and annual impact of these requirements.

In the notice of final requirements, we will display the control number assigned by OMB to any information collection activities proposed in these interim final requirements and adopted in the notice of final requirements.

For SEA consultation with stakeholders and seeking public input, we estimate that an SEA will need, on average, 80 staff-hours to engage in meaningful consultation with identified stakeholder groups and 40 staff-hours to consider public input, for a total estimated average of 120 staff-hours. At $97.28 per SEA staff-hour, the average estimated cost to comply with the requirements is approximately $12,000. For 52 SEAs (including for the District of Columbia and the Commonwealth of Puerto Rico), the total estimated cost is $607,000, and the total estimated burden is 6,240 hours.

Under the interim final requirements, an SEA must facilitate consultation with stakeholders and ongoing communication with the public by posting on its website information on the number of schools in the State providing different modes of instruction and on student enrollment and (if available) attendance, and it must update such information regularly. We expect that SEAs generally possess much of this information and estimate that an SEA will need, on average, 33 hours to comply with the facilitation requirement, including information updates. At $97.28 per SEA staff-hour, the average estimated cost to comply with the requirements is approximately $3,200. For 52 SEAs, the total estimated cost is $166,800 and the total burden is 1,716 hours. This estimate differs from the estimate in the *Regulatory Impact Statement* due to calculating the annual impact, rather than the net impact.

We estimate that an LEA will need, on average, 40 staff-hours to develop an ARP ESSER plan that meets the requirements and to make its plan publicly available. At $97.28 per LEA staff-hour, the average estimated cost to comply with the ARP ESSER plan development requirement is approximately $3,900. For an estimated 15,000 LEAs receiving ARP ESSER funds, the total estimated cost is $58,368,000, and the total burden is 600,000 hours.

For LEA consultation with stakeholders and seeking public input, we estimate that an LEA will need, on average, 30 staff-hours to engage in meaningful consultation with identified stakeholder groups and to consider public input, for a total of 30 staff-hours. At $97.28 per LEA staff-hour, the average estimated cost to comply with the requirement is $3,900. For an estimated 15,000 LEAs receiving ARP ESSER funds, the total estimated cost is $43,776,000, and the total estimated burden is 450,000 hours. We estimate that an LEA will need an average of 10 hours to comply with the requirement that its ARP ESSER plan be accessible, including to parents with limited English proficiency and individuals with disabilities. At $97.28 per LEA

staff-hour, the average estimated cost to comply with the requirement is approximately $1,000. For an estimated 15,000 LEAs receiving ARP ESSER funds, the total estimated cost is $14,592,000, and the total estimated burden is 150,000 hours.

☐ Start Printed Page 21206

We estimate that 5,000 LEAs will need to develop or revise safe return to in-person instruction and continuity of services plans to meet statutory and regulatory requirements, using an average of 40 staff-hours. At $97.28 per LEA staff-hour, the average estimated cost for complying with the requirements is $3,900. The total estimated cost is $19,456,000, and the total estimated burden is 200,000 hours.

Under these interim final requirements, an LEA must review its plan at least every 6 months, revise its plan as needed, and consider public input in the review and revision. Under these interim final requirements, an LEA will need to review its plan twice per year. We estimate that each review will require an average of 15 staff-hours for a total burden of 30 hours per year. We estimate that the average LEA will revise its plan once over the course of the next three years and require an average of 20 staff-hours for plan revision, an average of 7 burden hours per year. The total average estimated staff-hours for complying with plan review and revision requirements is 27 staff-hours annually, and at $97.28 per LEA staff-hour, the average estimated cost is $2,600. For an estimated 15,000 LEAs receiving ARP ESSER funds, the total estimated cost for complying with the plan review and revision requirements is $39,398,000, and we estimate a total burden of 405,000 hours. This estimate differs from the estimate in the *Regulatory Impact Statement* due to calculating the annual impact, rather than the net impact.

Finally, we estimate that an LEA will need an average of 15 hours to comply with the requirement that its plan for the safe return to in-person instruction and continuity of services be accessible, including to parents with limited English proficiency and individuals with disabilities. At $97.28 per LEA staff-hour, the average estimated cost to comply with the requirement is approximately $1,500. For an estimated 15,000 LEAs receiving ARP ESSER funds, the total estimated cost is $21,888,000, and we estimate a total burden of 225,000 hours.

Collectively, we estimate that these new information collection activities will result in a total estimated cost of $198,791,800 and a total estimated burden of 2,037,956 hours to the public annually. The Department is requesting an emergency paperwork clearance from OMB on the data collections associated with these interim final requirements.

We must receive your comments on the collection activities contained in these interim final requirements on or before [INSERT DATE 30 DAYS FROM THE DATE OF PUBLICATION IN THE **FEDERAL REGISTER**]. Comments related to the information collection activities must be submitted electronically through the Federal eRulemaking Portal at *www.regulations.gov (http://www.regulations.gov)* by selecting the Docket ID number ED-2021-OESE-0061 or via postal mail, commercial delivery, or hand delivery by referencing the docket ID number and the title of the information collection request at the top of your comment. Comments submitted by postal mail or delivery should be addressed to the PRA Coordinator of the Strategic Collections and Clearance Governance and Strategy Division, U.S. Department of Education, 400 Maryland Ave. SW, LBJ, Room 6W208D, Washington, DC 20202-8240.

## Note:

The Office of Information and Regulatory Affairs in OMB and the Department review all comments related to the information collection activities posted at *www.regulations.gov (http://www.regulations.gov)*.

We consider your comments on these proposed collection activities in—

- Deciding whether the proposed collection activities are necessary for the proper performance of our functions, including whether the information will have practical use;

- Evaluating the accuracy of our estimate of the burden of the proposed collection activities, including the validity of our methodology and assumptions;

- Enhancing the quality, usefulness, and clarity of the information we collect; and

- Minimizing the burden on those who must respond. This includes exploring the use of appropriate automated, electronic, mechanical, or other technological collection techniques.

Collection of Information

| Information collection activity | Estimated number responses | Hours per response | Total estimated burden hours | Estimated cost at an hourly rate of $97.28 |
|---|---|---|---|---|
| SEA Consultation with Public | 52 | 120 | 6,240 | $607,000 |
| SEA Facilitation and Updates | 52 | 33 | 1,716 | 166,800 |
| LEA ARP ESSER Plan Creation | 15,000 | 40 | 600,000 | 58,368,000 |
| LEA Consultation with Public | 15,000 | 30 | 450,000 | 43,776,000 |
| LEA ARP ESSER Plan Accessibility | 15,000 | 10 | 150,000 | 14,592,000 |
| LEA Plan for Safe Return *Creation* | 5,000 | 40 | 200,000 | 19,456,000 |
| LEA Safe Return Plan Review | 15,000 | 27 | 405,000 | 39,938,000 |
| LEA Plan for Safe Return Accessibility | 15,000 | 15 | 225,000 | 21,888,000 |
| Annualized Total | 80,104 | 315 | 2,037,956 | 198,791,800 |

Case 2:21-cv-04024-MSG　Document 27　Filed 09/08/21　Page 27 of 29

In addition to the information collection activities that are a result of these interim final requirements, the Department is issuing an ARP ESSER State Plan application template that creates burden for the public. The content of the template is based on the ARP ESSER statute, in particular the required SEA and LEA set asides (see ARP sections 2001(e)(1) (LEA set aside) and (f)(1)-(3) (SEA set asides)), as well as the regulatory requirements in these interim final requirements. The estimated burden hours for completing the ARP ESSER State Plan application template are accounted for in a separate emergency information collection request to OMB.

## Intergovernmental Review

The ARP ESSER program is not subject to Executive Order 12372 and the regulations in 34 CFR part 79 (/select-citation/2021/04/22/34-CFR-79).

*Accessible Format:* On request to the program contact person listed under **FOR FURTHER INFORMATION CONTACT**, individuals with disabilities can obtain this document in an accessible format. The Department will provide the ⬜ requestor with an accessible format that may include Rich Text Format ("RTF") or text format ("txt"), a thumb drive, an MP3 file, braille, large print, audiotape, compact disc, or other accessible format.

⬜ Start Printed Page 21207

*Electronic Access to This Document:* The official version of this document is the document published in the **Federal Register**. You may access the official edition of the **Federal Register** and the Code of Federal Regulations at *www.govinfo.gov (http://www.govinfo.gov)*. At this site you can view this document, as well as all other documents of this Department published in the **Federal Register**, in text or portable document format ("PDF"). To use PDF you must have Adobe Acrobat Reader, which is available free at the site.

You may also access documents of the Department published in the **Federal Register** by using the article search feature at: *www.federalregister.gov (http://www.federalregister.gov)*. Specifically, through the advanced search feature at this site, you can limit your search to documents published by the Department.

Miguel Cardona,

Secretary of Education.

## Footnotes

*1. NAEP 2021 School Survey, released by the Department of Education Institute of Education Sciences (March 24, 2021), available at https://nces.ed.gov/nationsreportcard/about/covid19.aspx (https://nces.ed.gov/nationsreportcard/about/covid19.aspx).*
Back to Citation

*2. Korman, H., O'Keefe, B., Repka, M., (2020, Oct. 21). Missing in the Margins: Estimating the Scale of the COVID-19 Attendance Crisis. Bellwether Education Partners. Retrieved from: https://bellwethereducation.org/publication/missing-margins-estimating-scale-covid-19-attendance-crisis#Why%20aren't%20students%20attending%20school (https://bellwethereducation.org/publication/missing-margins-estimating-scale-covid-19-attendance-crisis#Why%20aren't%20students%20attending%20school)?.*
Back to Citation

*3. Section 2001(c) of the ARP Act.*
Back to Citation

*4. Section 2001(d)(1) of the ARP Act.*
Back to Citation

*5. "Academic impact of lost instructional time" has the same meaning as "learning loss," which is the term that is used in the ARP Act.*
Back to Citation

*6. Section 2001(f)(1)-(3) of the ARP Act.*
Back to Citation

*7. Id.*
Back to Citation

*8. Section 2001(f)(4) of the ARP Act.*
Back to Citation

*9. Id.*
Back to Citation

*10. Bureau of Labor Statistics. (2021). Employment, Hours, and Earnings from the Current Employment Statistics survey (National) for all employees, local government education, seasonally adjusted. Data extracted on April 1, 2021. https://beta.bls.gov/dataViewer/view/timeseries/CES9093161101 (https://beta.bls.gov/dataViewer/view/timeseries/CES9093161101).*
Back to Citation

*11. Section 2001(e)(1) of the ARP Act.*
Back to Citation

*12. See Korman, H., O'Keefe, B., & Repka, M., (2020, Oct. 21). Missing in the Margins: Estimating the Scale of the Covid-19 Attendance Crisis. Bellwether Education Partners. Retrieved from: https://bellwethereducation.org/publication/missing-margins-estimating-scale-covid-19-attendance-crisis#Why%20aren't%20students%20attending%20school (https://bellwethereducation.org/publication/missing-margins-estimating-scale-covid-19-attendance-crisis#Why%20aren't%20students%20attending%20school)?; Sparks, S., (2020, Nov. 12) Children's Mental Health Emergencies Skyrocketed After COVID-19 Hit. What Schools Can Do, Education Week. Retrieved from: https://www.edweek.org/leadership/childrens-mental-health-emergencies-skyrocketed-after-covid-19-hit-what-schools-can-do/2020/11 (https://www.edweek.org/leadership/childrens-mental-health-emergencies-skyrocketed-after-covid-19-hit-what-schools-can-do/2020/11); Dorn, E., Hanckock, B., Sarakatsannis, J., & Viruleg, E. (2020). COVID-19 and Learning Loss—Disparities Grow and Students Need Help. https://www.mckinsey.com/industries/public-and-social-sector/our-insights/covid-19-and-learning-loss-disparities-grow-and-students-need-help (https://www.mckinsey.com/industries/public-and-social-sector/our-insights/covid-19-and-learning-loss-disparities-grow-and-students-need-help)#; Kuhfeld, M., Tarasawa, B., Johnson, A., Ruzek, E., & Lewis, K. (2020, Nov.). Learning During COVID-19: Initial Findings on Students' Reading and Math Achievement and Growth. NWEA. Retrieved from: https://www.nwea.org/research/publication/learning-during-covid-19-initial-findings-on-students-reading-and-math-achievement-and-growth/ (https://www.nwea.org/research/publication/learning-during-covid-19-initial-findings-on-students-reading-and-math-achievement-and-growth/).*
Back to Citation

*13. ARP ESSER funds are subject to the Tydings amendment in section 421(b) of the General Education Provisions Act, 20 U.S.C. 1225 (https://www.govinfo.gov/link/uscode/20/1225?type=usc&year=mostrecent&link-type=html)(b), and are therefore available to SEAs and LEAs for obligation through September 30, 2024. Review and revisions, if necessary, are not required during the Tydings period.*
Back to Citation

*14. As described above, each plan must address: Universal and correct wearing of masks; modifying facilities to allow for physical distancing (e.g., use of cohorts/podding); handwashing and respiratory etiquette; cleaning and maintaining healthy facilities, including improving ventilation; contact tracing in combination with isolation and quarantine, in collaboration with the State, local, territorial, or Tribal health departments; diagnostic and screening testing; efforts to provide vaccinations to school communities; appropriate accommodations for children with disabilities with respect to health and safety policies; and coordination with State and local health officials.*
Back to Citation

*15. https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/operation-strategy.html (https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/operation-strategy.html).*
Back to Citation

*16. ED COVID-19 Handbook Vol. 2, Roadmap to Reopening Safely and Meeting All Students' Needs, page 8, available at: https://www2.ed.gov/documents/coronavirus/reopening-2.pdf (https://www2.ed.gov/documents/coronavirus/reopening-2.pdf).*
Back to Citation

*17. "Academic impact of lost instructional time" has the same meaning as "learning loss," which is the term that is used in section 2001 of the ARP Act.*
Back to Citation

*18. Executive Order 13563, (/executive-order/13563) section 1(c).*
Back to Citation

*19. U.S. Office of Management and Budget (2011, Feb. 2). Memorandum for the Heads of Executive Departments and Agencies and of Independent Regulatory Agencies on Executive Order 13563, (/executive-order/13563) "Improving Regulation and Regulatory Review". Office of Information and Regulatory Affairs. Washington, DC.*
Back to Citation

*20. See https://www.bls.gov/oes/2020/may/oes_nat.html (https://www.bls.gov/oes/2020/may/oes_nat.html).*
Back to Citation

[FR Doc. 2021-08359 (/a/2021-08359) Filed 4-21-21; 8:45 am]

BILLING CODE 4000-01-P

---

PUBLISHED DOCUMENT