**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ALICIA GEERLINGS, et al.,** | |
| *Plaintiffs,* | **Civil Action** |
| *v.* | **No.  21-cv-4024** |
| **TREDYFFRIN/EASTTOWN SCHOOL DISTRICT,** | |
| *Defendant.* | |

**<u>MEMORANDUM OPINION</u>**

**GOLDBERG, J.**                                             **September 27, 2021**

In response to the continuing coronavirus (COVID-19) pandemic, Pennsylvania's Acting Secretary of Health recently ordered that all schools require face coverings. Plaintiffs Alicia Geerlings, Andrew McLellan, Sarah Marvin, and David Governanti ("Plaintiffs") oppose masking and on behalf of their children, have moved for emergency injunctive relief, which if granted, would prohibit Defendant Tredyffrin/Easttown School District (the "District") from implementing the Secretary's Order while this lawsuit proceeds.

Immediately following the filing of Plaintiffs' Motion and several phone conferences with counsel, a hearing was held on September 14, 2021, wherein the four Plaintiffs and a District official testified. Plaintiffs have requested that this hearing continue so that they may further question the District representative and offer the testimony of a physiologist regarding the alleged unsafe effects of masks. But having carefully examined Plaintiffs' claims, as well as their proffers regarding further testimony, I conclude that none of this additional evidence would assist Plaintiffs

1

in meeting the high burden of proof necessary to obtain the type of extraordinary emergency relief they seek. Consequently, for the reasons stated below, I will deny Plaintiffs' Motion.

In so ruling, I do not decide whether Plaintiffs' claims will ultimately succeed or fail. Rather, I find that, at this early stage of this litigation, Plaintiffs have not shown that the District's policy should be set aside before a full adjudication of the merits.

## I.    PROCEDURAL HISTORY

On September 8, 2021, Plaintiffs filed their Complaint and moved for a temporary restraining order prohibiting the District from enforcing its policy that students wear face masks while in school.

Although Plaintiffs have been somewhat vague about the precise legal theories under which they challenge the District's policy, I understand Plaintiffs' claims to be the following: First, Plaintiffs contend the Secretary's school mask Order infringes on their constitutional right to practice their religious beliefs pursuant to the First Amendment. Second, Plaintiffs argue the District cannot require students to wear masks because, under the Food, Drug and Cosmetic Act, 21 U.S.C. § 301 et seq., masks are "medical devices," which have not been approved by the Food and Drug Administration. Third, Plaintiffs insist the District's policy cannot be enforced because the Pennsylvania Secretary of Health lacked authority to issue the Order that the District is implementing.

As noted above, on September 14, 2021, I held a hearing where all four Plaintiffs and one District official testified. At the close of the day's testimony, I reserved decision on whether Plaintiffs would be allowed to call an expert physiologist and further question the District official. (Notes of Testimony ("N.T.") 176:8-177:2, 197:23-198:4.) The following day, the District moved to exclude the physiologist, and I directed that Plaintiffs' response clearly explain how the

proffered expert testimony would support Plaintiffs' claims. (ECF Nos. 12, 14.) Plaintiffs filed

their response on September 17, 2021. (ECF No. 17.)

II.   **SUMMARY OF THE SEPTEMBER 14, 2021 HEARING TESTIMONY**

The District requires all students in its schools to wear masks to prevent the spread of

COVID-19. The District believes it is required to implement such a policy based on an Order from

Pennsylvania's Secretary of Health, who, curiously, is not a party to this lawsuit. That Order,

issued August 31, 2021 and effective September 7, 2021, states, in relevant part:

> Each teacher, child/student, staff, or visitor working, attending, or visiting a School
> Entity shall wear a face covering indoors, regardless of vaccination status, except
> as set forth in [various exceptions].

(ECF No. 2-6 at 4.) The Order also permits eight exceptions where face coverings are not required,

including for medical conditions, hearing impairments, and extracurricular activities such as sports

and music. (Id.) There is no exception for religious practices. (Id.)

Plaintiffs are four parents of students in the District who seek to have their children attend

schools in the District in person but without wearing masks. (N.T. 28:25-29:2, 80:20-22, 118:1-3,

137:23-24.) In one of their claims, Plaintiffs posit that the School District should excuse their

children from the mask mandate on First Amendment religious grounds. Plaintiffs raise "strong

objections" to wearing masks and describe these objections as religious or spiritual in nature. These

beliefs (as well as other evidence of record) are summarized below.

A.   **Plaintiffs' Testimony**

1.   *Sarah Marvin*

Ms. Marvin is a Christian and previously attended a Presbyterian church in Devon,

Pennsylvania, where she was and still is a deacon. Ms. Marvin recently left the church when it

started requiring masks. Ms. Marvin explained that she does not share all beliefs with her church,

instead following the Christian Bible. (N.T. 52:15-22, 53:18-21, 54:21-55:7.)

Ms. Marvin believes people are made in the image of God and it therefore dishonors God to cover our faces. The only part of the body Ms. Marvin believes should not be covered is the head. (N.T. 29:20-24, 55:20-22.) Ms. Marvin stated that the Bible—specifically, one of the Epistles of Paul to the Corinthians—instructs that face coverings dishonor God, though she did not name a specific book or verse. (N.T. 55:22-24, 75:20-76:12.) Ms. Marvin said her opposition to face coverings was "not necessarily" a new belief, but acknowledged that, before the pandemic, no one had asked her to wear a mask. (N.T. 30:2-14.)

### 2. Alicia Geerlings

Ms. Geerlings is also a Christian. She used to attend an Episcopal church in Wayne, Pennsylvania, but, like Ms. Marvin, recently left when the church started requiring masks. (N.T. 81:11-25.)

Ms. Geerlings believes the body is a temple and must not be harmed, and in her view, masks violate the prohibition on harming the body because they are unhealthy. (N.T. 82:7-11, 83:17-18, 84:18-19, 97:1-6, 99:1-2.) She explained that wearing a mask caused "maskne" (mask acne) and sinus infections for which she has been taking antibiotics, and her son has experienced severe headaches on the days he has worn a mask. (N.T. 82:11-18, 84:12-18, 87:1-10.)

On cross examination, Ms. Geerlings acknowledged her son would voluntarily wear a mask to enter a clubhouse to play squash, though he removed the mask while playing. (N.T. 110:12-111:8.) Ms. Geerlings also agreed that communicable diseases are harmful and that God, in her view, would want us to protect ourselves from communicable diseases. (N.T. 102:5-11.)

### 3. David Governanti

Mr. Governanti does not belong to any organized religion, does not pray to God, and stated that he could not pin his religious beliefs on a Bible or church. However, he does believe there is

"something else out there" and that it is not "just us." Mr. Governanti arrived at his beliefs through research and forming his own opinions. (N.T. 119:2-7, 120:3-5.)

In this manner, Mr. Governanti came to believe that he must not harm his daughter, which, in his view, means he must not allow his daughter to wear a mask. Mr. Governanti has seen his daughter come home from school lethargic and suffering from headaches and anxiety, which he concluded was due to wearing a mask. (N.T. 119:2-25, 120:22-23, 121:6-20.) Mr. Governanti acknowledged that his daughter went to school and wore a mask last school year, but Mr. Governanti objects to her wearing a mask this year because he now knows more about the harmful effects of masks. (N.T. 129:22-131:2.)

### 4.   *Andrew McLellan*

Although Mr. McLellan believes that "Jesus … [is] the son of God" and "died for our sins," he described his beliefs as less of a "religion" and more of a "spirituality." He does not go to church. (N.T. 128:12-13, 138:13-14, 162:1-3, 152:11-13.)

Mr. McLellan believes God intervened in his life to save him from certain trauma, and that masks are a mockery of the gift of life because they cover what makes us human and show a lack of gratitude to the creator. (N.T. 138:14-139:24, 161:13-22.) Mr. McLellan acknowledged that his son wears a helmet for football and a head covering for wrestling. (N.T. 153:12-19.)

### B.   **Medical and Disability Issues**

Plaintiffs have not pleaded a claim related to their children's medical conditions. Nor have they formally submitted applications for such exemptions to the District. Nonetheless, two Plaintiffs—Sarah Marvin and Alicia Geerlings—press that their children should receive a medical or disability exemption from the mask mandate. (N.T. 31:9-11, 85:17-21.)

Plaintiff Sarah Marvin testified that her son has an auditory processing and speech language disorder and the mask impedes his ability to communicate. Ms. Marvin also stated that wearing a

mask has made her son feel nauseous and that he almost fainted, though she acknowledged her son does not have a diagnosed respiratory condition. (N.T. 33:10-34:11, 35:1-3, 37:6-11.) Ms. Marvin's son is in a vocational program that she believes is important to his future success given that his disability prevents him from attending college. (N.T. 34:22-24, 46:23-47:7, 47:21-23, 49:18-19.) Because Ms. Marvin's son has opted to stay home from school rather than wear a mask to attend in person, she believes he is at imminent risk of being removed from the vocational program. (N.T. 43:6-11, 49:20-24.)

Ms. Geerlings would also like a medical exemption for her son because he experiences sinus issues and migraines. According to Ms. Geerlings, on the days her son has worn a mask, he has come home with severe headaches. (N.T. 87:2-10, 95:22-96:2.)[1]

The Secretary's Order specifically allows for medical exemptions to the mask policy. (ECF No. 2-6 § 3(B).) But before the District will consider a medical exemption, it requires a waiver of the student's medical privacy rights under the Health Insurance Portability and Accountability Act (HIPAA) so that it can obtain information about the alleged medical condition. (N.T. 62:12-20.) However, none of the Plaintiffs seeking medical exemptions are willing to waive their children's rights under HIPAA. (N.T. 32:7-13, 114:7-12, 116:4-12, 123:2-9.)

---

[1] Mr. Governanti was unclear as to whether he is seeking a medical exemption to the mask mandate for his daughter. Mr. Governanti believes masks are harmful to his daughter's mental state and have caused her to suffer anxiety. (N.T. 127:4-17, 128:17-21.) However, Mr. Governanti acknowledged that his daughter has no diagnosed medical condition. (N.T. 133:14-15.)

Mr. McLellan has not sought a medical exemption for his son, but is nonetheless concerned his son might be suffering from medical issues related to masks. (N.T. 140:14-18, 141:6-8.) Specifically, Mr. McLellan is concerned about his son's respiratory issues and that his son needs an inhaler for allergies. (N.T. 141:15-142:8.)

### C.    Other Evidence

As for other testimony, Plaintiffs called a District official, Chris Groppe, as if on cross examination. Dr. Groppe, as the Director of Safety and Student Services for the District, serves as its "pandemic coordinator" and is in charge of administering the mask policy. He acknowledged having no medical training. (N.T. 184:2-14.)

Dr. Groppe conceded that the District will not consider any request for a religious exemption because the Secretary's Order does not allow it. (N.T. 199:7-20.) Dr. Groppe explained that when the District receives a request for a medical exemption, it is reviewed by administrators and school nurses. (N.T. 185:21-186:17, 187:4-13, 190:25-191:14.)

At the September 14, 2021 hearing, Plaintiffs' counsel also requested that he be able to further question Dr. Groppe regarding the history of negotiations between Plaintiffs and the District over the District's mask policy. (N.T. 195:11-14.) Because the negotiations between the parties are not germane to the relief requested by Plaintiffs, I will not permit further questioning of this witness. (N.T. 197:23-198:4.)

Plaintiffs also offered to present the testimony of Shannon Grady, who Plaintiffs claim is an expert in physiology (the study of the functioning of the human body). (N.T. 167:6-10.) Ms. Grady proposed to demonstrate, using a portable carbon dioxide meter, that the concentration of carbon dioxide under a face mask exceeds levels normally accepted for indoor air quality. (N.T. 168:10-169:21; ECF No. 17-2.) In a brief report, Ms. Grady refers to scientific literature regarding the adverse effects of breathing elevated levels of carbon dioxide on the functioning of the human body. (ECF No. 17-2.) Ms. Grady's testimony is the subject of the District's pending motion to exclude. (ECF No. 12.)

I have carefully reviewed the evidence submitted thus far, with the view that the issue before me is not a merits decision but a request for emergency injunctive relief. As explained

below, I find I have enough information before me to rule on Plaintiffs' claims and request for interim injunctive relief.

### III.   <u>LEGAL STANDARD</u>

As noted above, Plaintiffs' Motion seeks an order setting aside the District's mask policy during the pendency of this litigation. This type of emergency, interim relief constitutes "an extraordinary remedy, which should be granted only in limited circumstances." <u>Ferring Pharms., Inc. v. Watson Pharms., Inc.</u>, 765 F.3d 205, 210 (3d Cir. 2014) (quotation marks omitted). A plaintiff seeking such an injunction must establish:

[1] that he is likely to succeed on the merits,

[2] that he is likely to suffer irreparable harm in the absence of preliminary relief,

[3] that the balance of equities tips in his favor, and

[4] that an injunction is in the public interest.

<u>Id.</u>

A movant is "likely to succeed on the merits" if she has a "reasonable probability of eventual success in the litigation." <u>Fam. Inada Co. v. FIUS Distributors LLC</u>, No. 19-cv-925, 2019 WL 5295178, at *4 (D. Del. Oct. 18, 2019). The movant does not need to show that her success is more likely than not. <u>Id.</u>

A ruling on a request for a temporary restraining order or preliminary injunction is not a ruling on the ultimate merits of the case. <u>See</u> <u>Oburn v. Shapp</u>, No. 75-1189, 1975 WL 11794, at *9 (3d Cir. Aug. 4, 1975). Rather, the question at this early stage is only whether the movant has met the high standard necessary to order a remedy before a full trial of the movant's claims. <u>Ferring Pharms.</u>, 765 F.3d at 210.

IV.     **DISCUSSION**

Having heard the evidence presented at the hearing, and considering the additional evidence Plaintiffs propose to offer, I find that Plaintiffs cannot meet their burden to show that they are reasonably likely to succeed on the merits of their claims. Absent such a showing, Plaintiffs are not entitled to the "extraordinary remedy" of a preliminary injunction. Ferring Pharms., 765 F.3d at 210. My reasons for so finding are discussed below for each of Plaintiffs' claims.

**A.     Religious Discrimination**

Plaintiffs' first claim is that the District's policy mandating masks infringes their constitutional rights and those of their children to practice their respective religions. Although Plaintiffs do not say so, I will consider this to be a claim under 42 U.S.C. § 1983 for violation of Plaintiffs' First Amendment rights.

Claims of religious discrimination present a unique and difficult challenge for judges. As the Third Circuit has observed,

> Few tasks that confront a court require more circumspection than that of determining whether a particular set of ideas constitutes a religion within the meaning of the first amendment. Judges are ill-equipped to examine the breadth and content of an avowed religion; we must avoid any predisposition toward conventional religions so that unfamiliar faiths are not branded mere secular beliefs. … Nonetheless, when an individual invokes the first amendment to shield himself or herself from otherwise legitimate state regulation, we are required to make such uneasy differentiations.

Africa v. Pennsylvania, 662 F.2d 1025, 1031 (3d Cir. 1981).

The First Amendment to the United States Constitution, made applicable to states through the Fourteenth Amendment, protects the right of the people to practice their religion. Fulton v. City of Philadelphia, 141 S. Ct. 1868, 1876 (2021). All four Plaintiffs ask that the District grant their children religious exemptions from having to wear masks in school. Some Plaintiffs sought

religious accommodation and were denied, while others declined to ask after being told that no religious accommodations were available. (N.T. 29:13-17, 80:25-81:2, 109:23-110:5, 118:19-23, 138:6-9.)

The District will not grant any religious exemption to any student, and takes the position that it is prohibited from doing so by the Secretary's Order. While the District's intention to comply with state mandates is understandable, federal law takes precedence, and the District's obligation to protect students' legitimate constitutional right to practice their religion cannot be set aside by an order from the Secretary of Health of Pennsylvania. See U.S. Const., art. VI, cl. 2; Pennsylvania v. Porter, 659 F.2d 306, 314-15 (3d Cir. 1981) ("The fourteenth amendment is the supreme law of the land in all of Pennsylvania."). Indeed, several health and safety measures, including those aimed at combating the spread of COVID-19, have been ruled unconstitutional because they denied accommodation for religious practice even though they allowed exceptions for secular activities deemed "essential." E.g., Tandon v. Newsom, 141 S. Ct. 1294, 1297 (2021); Roman Catholic Diocese of Brooklyn v. Cuomo, 141 S. Ct. 63, 66 (2020). In particular, the United States Supreme Court recently halted California's restrictions on indoor gatherings because the state exempted secular activities but not comparable religious ones. Tandon, 141 S. Ct. at 1297.

But the fact that the District's policy may raise constitutional issues does not automatically provide Plaintiffs with a clear path to successfully challenge that policy. Before a person can obtain relief from government action based on religious objections, that person must come forward with a sincere religious belief that is contrary to the challenged action. Africa, 662 F.2d at 1030. Accordingly, before I consider whether the District should be required to accommodate religious objections to mask-wearing, I must determine whether Plaintiffs have sincere religious beliefs that are burdened by the policy.

10

A sincere religious belief must satisfy two requirements. First, the belief must be "sincerely held." <u>Africa</u>, 662 F.2d at 1030. "Without some sort of required showing of sincerity on the part of the individual or organization seeking judicial protection of its beliefs, the first amendment would become a limitless excuse for avoiding all unwanted legal obligations." <u>Id.</u> (quotation marks omitted). Whether a belief is sincerely held is a question of fact. <u>United States v. Seeger</u>, 380 U.S. 163, 185 (1965).

Second, the belief must be "religious in nature, in the claimant's scheme of things." <u>Africa</u>, 662 F.2d at 1030. "A way of life, however virtuous and admirable, may not be interposed as a barrier to reasonable state regulation of education if it is based on purely secular considerations; to have the protection of the Religion Clauses, the claims must be rooted in religious belief." <u>Wisconsin v. Yoder</u>, 406 U.S. 205, 215 (1972). It is therefore not sufficient for Plaintiffs to hold a "sincere opposition" to mask-wearing; Plaintiffs "must show that [their] opposition" to mask-wearing "is a religious belief." <u>Brown v. Children's Hosp. of Philadelphia</u>, 794 F. App'x 226, 227 (3d Cir. 2020) (quotation marks omitted) (finding healthcare worker's objection to receiving a flu vaccine not to be a religious belief).

To add some structure to the question of which beliefs count as religious, The Third Circuit has offered three guideposts. "First, a religion addresses fundamental and ultimate questions having to do with deep and imponderable matters. Second, a religion is comprehensive in nature; it consists of a belief-system as opposed to an isolated teaching. Third, a religion often can be recognized by the presence of certain formal and external signs." <u>Africa</u>, 662 F.2d at 1032. These observations are only indicia, and must be applied with flexibility. <u>Id.</u> at 1032 n.13.

Based on this precedent and the testimony presented to me at the September 14, 2021 hearing, I conclude that, although each of the four Plaintiffs has a passionate objection to wearing masks, none of them has a belief that warrants First Amendment protection.

### 1.      Sarah Marvin

Ms. Marvin testified that she objects to wearing masks because she believes people are made in the image of God and it therefore dishonors God to cover our faces. (N.T. 29:20-24.) However, I am unable to conclude that this belief is a sincere tenet of Ms. Marvin's religion.

Initially, I note that Ms. Marvin offered few details about how she came to believe face masks were incompatible with her faith. The church where she is a deacon does not teach that face masks should not be worn—in fact it requires them. (N.T. 53:18-21.) And, while Ms. Marvin did reference a verse in the Christian Bible, she seemed unclear as to the verse or its content. (N.T. 55:22-24, 75:20-76:12 ("THE COURT: ... Is it Corinthian 1 or 2 and what verse? And give me a little more detail. [Ms. Marvin]: ... I can't—I'm going to not right now remember exactly, but there— ... are specific—multiple specific lines in The Bible where it talks about that we are made in the image of God— ... and that head coverings and covering our face is a mark of dishonor.").) Ms. Marvin is not required, as a legal matter, to hold the same beliefs as any other person, church, or organization. Frazee v. Illinois Dep't of Emp. Sec., 489 U.S. 829, 834 (1989). But the fact that Ms. Marvin arrived at her feelings toward face coverings on her own and in response to the recent pandemic contributes to an impression that her belief is an "excuse for avoiding ... unwanted legal obligations." Africa, 662 F.2d at 1030.

It is not easy for me to pass on the delicate question of whether another person's professed religious beliefs are sincere, and I do so mindful and respectful of Ms. Marvin's position. However, "the very concept of ordered liberty" under the First Amendment requires me to draw such distinctions. Yoder, 406 U.S. at 215-16. Having carefully considered Ms. Marvin's testimony, I

find she has not shown, at this stage of the proceedings, that her objection to masks is a sincere religious belief.

Even were I to accept that Ms. Marvin sincerely believes she and her son should not wear masks, I would still not be persuaded that refusing to wear a mask is a tenet of her religion. Religious adherents often profess that faith inspires much of their secular lives, but those activities are still secular. As the Third Circuit observed:

> The notion that all of life's activities can be cloaked with religious significance is, of course, … [not] foreign to … established religions. Such a notion by itself, however, cannot transform an otherwise secular, one-dimensional philosophy into a comprehensive theological system. It is one thing to believe that, because of one's religion, day-to-day living takes on added meaning and importance. It is altogether different, however, to contend that certain ideas should be declared religious and therefore accorded first amendment protection from state interference merely because an individual alleges that his life is wholly governed by those ideas. We decline to adopt such a self-defining approach to the definition-of-religion problem.

Africa, 662 F.2d at 1035.

In Ms. Marvin's case, she has not demonstrated that she practices keeping her face uncovered the way followers of Catholicism practice communion or those of Jewish faith practice eating unleavened bread on Passover. Her decision to eschew masks corresponds to no teaching of her community, upbringing, or other "comprehensive … belief-system," nor does she practice it through "formal and external signs" such as holidays, ceremonies, or clergy. Africa, 662 F.2d at 1032. It is, rather, an "isolated moral teaching" that reflects the circumstances of the ongoing pandemic and seems to be more associated with health restrictions. Id.

Having heard and weighed the testimony, I find that it is not reasonably likely that Ms. Marvin will prevail on her claim that masks violate her sincerely held religious beliefs.

### 2.  *Alicia Geerlings*

Ms. Geerlings objects to wearing masks because she believes it is immoral to harm the body, and masks, in her view, harm the body. (N.T. 82:7-11, 83:17-18, 84:18-19, 97:1-6, 99:1-2.)

In support, she referenced physical ailments that she and her son have suffered that she believes were caused by wearing masks. (N.T. 82:11-18, 84:12-18.)

As with Ms. Marvin, I am not persuaded that Ms. Geerlings sincerely objects to wearing masks on religious grounds. Her belief seems to be tethered to the ongoing pandemic and its associated health restrictions. Moreover, Ms. Geerlings has not pointed to anything in her community, church, or past experiences that would substantiate her contention that she has a religious practice of not wearing masks.

Even if I were to accept that Ms. Geerlings sincerely believes the body is a temple and should not be harmed, it would be a step too far to count everything she believes about healthy living as a religious practice. The notion that we should not harm our bodies is ubiquitous in religious teaching, but a "concern that [a treatment] may do more harm than good[] is a medical belief, not a religious one." Fallon v. Mercy Cath. Med. Ctr. of Se. Pennsylvania, 877 F.3d 487, 492 (3d Cir. 2017). Even though the two may sometimes overlap, such as where a prohibition on eating pork serves both sanitary and spiritual ends, it takes more than a generalized aversion to harming the body to nudge a practice over the line from medical to religious.

Ms. Geerlings's belief that masks are harmful is a pragmatic one founded on her experience with acne and a sinus infection. While it may be understandable that Ms. Geerlings would believe masks are harmful after suffering these ailments, this belief does not "address[] fundamental and ultimate questions" the way a religion does. Africa, 662 F.2d at 1032. Ms. Geerlings's moral concern for the body seems to be an "isolated teaching" rather than a "belief-system," and corresponds to no "formal and external signs." Id. And her acknowledgment that her son voluntarily wears a mask at a private squash club undermines her position that masking violates her family's religion.

I am thus unable to conclude, at this stage of the proceedings, that Ms. Geerlings's opposition to wearing masks is religious in nature.

### 3.    *David Governanti*

Like Ms. Geerlings, Mr. Governanti opposes wearing masks because he believes it is immoral to harm people and masks harm people. (N.T. 119:2-25.) As with Ms. Geerlings, I find that this belief is more rooted in medical, not religious, concerns.

Mr. Governanti has no church affiliation and does not subscribe to any Bible. (N.T. 119:2-4.) He described his religion as a set of personal beliefs based on his own research. (N.T. 119:2-7.) His personal belief is that masks will harm his daughter and that his daughter therefore should not wear them. (N.T. 119:2-25.)

It is clear from this testimony that Mr. Governanti's feelings about masks are not part of any comprehensive belief system that could be called a religion. His worldview based on independent research "has no functional equivalent of the Ten Commandments, the New Testament Gospels, the Muslim Koran, Hinduism's Veda, or Transcendental Meditation's Science of Creative Intelligence." Africa, 662 F.2d at 1033. Rather, Mr. Governanti's views are his personal understandings of right and wrong.

Such a "personal moral code," while commendable, is not afforded the protection of the Free Exercise Clause. Id. at 1034. "An individual or group may adhere to and profess certain political, economic, or social doctrines, perhaps quite passionately. The first amendment, though, has not been construed, at least as yet, to shelter strongly held ideologies of such a nature, however all-encompassing their scope." Africa, 662 F.2d at 1034. Indeed, "the very concept of ordered liberty precludes allowing every person to make his own standards on matters of conduct in which society as a whole has important interests." Yoder, 406 U.S. at 215-16. I therefore find that Mr. Governanti is unlikely to succeed on the merits of his claim.

15

### 4.    *Andrew McLellan*

Like Ms. Marvin, Mr. McLellan opposes masks because they cover the body. (N.T. 139:17-24.) Mr. McLellan believes the body is a gift from the creator and, therefore, to cover that gift makes a mockery of it. (Id.)

I am not persuaded that Mr. McLellan has a sincere religious practice of not covering his face. He objects only to covering the face, but yet, for sporting events, does not oppose his son wearing a football helmet or wrestling headgear. (N.T. 153:15-19.) Mr. McLellan also did not identify any source for his belief that masks disrespect the creator nor did he testify to having considered this belief before the current pandemic. Rather, his objection to masks appears to be an isolated concept that is personal to him and not part of any "comprehensive … belief-system." Africa, 662 F.2d at 1032.

Moreover, an abstract belief that life is a gift from God, like a generalized opposition to harming the body, cannot by itself make everything one does to appreciate life part of a religion. Cf. Fallon, 877 F.3d at 492. Although Mr. McLellan offered a powerful story of how his faith transformed his life, the task before me is a legal one that requires "objective guidelines in order to avoid ad hoc justice." Africa, 662 F.2d at 1032 n.13. Within the confines of that legal task, Mr. McLellan's religion cannot be defined so amorphously as to encompass everything he considers to be transformative in his life.

Having heard and considered Mr. McLellan's testimony, I find that Mr. McLellan is not likely to prevail on his claim that he has a sincere religious opposition to wearing masks.

### B.    **Unapproved Medical Device**

Plaintiffs' second claim is that the District cannot require students to wear masks because, under the Food, Drug and Cosmetic Act (FDC Act), masks are "medical devices," and the Food and Drug Administration (FDA) has not approved them.

Although not cited by Plaintiffs, they appear to be referring to 21 U.S.C. § 351(f), which declares certain unapproved medical devices to be "adulterated" within the meaning of the FDC Act. The Act further makes it unlawful to sell adulterated medical devices in interstate commerce, 21 U.S.C § 331(a), and grants the FDA authority to seize adulterated medical devices, 21 U.S.C. § 334.

These provisions, however, do not limit the ability of the District to require that students wear masks. The District is not engaged in manufacturing, marketing, or selling masks, making the restrictions set out in 21 U.S.C § 331(a) inapplicable. And, even if mask vendors were subject to certain regulatory obligations, those obligations apparently do not impede the ability of students to obtain masks to comply with the mandate because masks are readily available. Nor do Plaintiffs explain why they, as opposed to the FDA, are the appropriate party to flag and remedy any violations of the FDC Act that might be occurring.

For these reasons, I find that Plaintiffs are not likely to succeed on this claim.

### C.    The Secretary of Health's Authority

Plaintiffs' third and final claim is that the District cannot require students to wear masks because the Pennsylvania Secretary of Health lacked authority to issue her August 31, 2021 Order mandating masks in all Pennsylvania schools.

Plaintiffs have not explained why it would be appropriate for a federal court to issue a remedy regarding a state executive order. The scope of the Secretary's authority is a question of state law normally resolved in state court. See Herman v. Clearfield Cty., Pa., 836 F. Supp. 1178, 1187 (W.D. Pa. 1993) ("Violations of state law … do not equate to constitutional injuries…."), aff'd, 30 F.3d 1486 (3d Cir. 1994); Vill. of Orland Park v. Pritzker, 475 F. Supp. 3d 866, 883 (N.D. Ill. 2020) ("[E]ven if Plaintiffs are ultimately correct that the Governor should have complied with the procedures set out in the [state statute] in implementing his response to COVID-19, they still

will not have established a federal constitutional violation."). In fact, the Secretary's authority to issue the August 31 Order is the subject of ongoing litigation in the Pennsylvania Commonwealth Court. See Corman v. Beam, No. 294 MD 2021 (Pa. Cmmw. Ct. filed Sept. 3, 2021). And if Plaintiffs mean to bring a state-law claim under this court's supplemental jurisdiction, they have not identified that claim or cited any applicable Pennsylvania cause of action. Therefore, even if I were to delve into whether the Secretary's Order was somehow invalid, Plaintiffs have not shown how I would have authority to prohibit the District from enforcing it.

For these reasons, I find that Plaintiffs have not, at this time, met their burden to show that they are likely to succeed on the merits of this claim.

## V.    REMAINING EVIDENTIARY ISSUES

I find it unnecessary to rule on the admissibility of the further testimony Plaintiffs propose to offer because the proffered testimony would not affect whether Plaintiffs have met the standard for preliminary injunctive relief.

First, Plaintiffs propose to offer the testimony of Shannon Grady, a physiologist, that the concentration of carbon dioxide under a mask exceeds limits ordinarily applicable to indoor air quality. Even if I were to hear and accept this testimony, at this stage of the proceedings it would not change my ruling on Plaintiffs' claims and their request for an injunction. Despite my directive that they do so, Plaintiffs have not explained how the concentration of carbon dioxide under a mask is relevant to any of the three claims they have raised. Whether masks are overall helpful or harmful in light of all potential health effects is a complex policy question that belongs to policymakers like the Secretary and the District, and Plaintiffs have not advanced a claim that these policies are so arbitrary as to amount to a violation of their rights. I therefore find it unnecessary to consider the District's motion to exclude Ms. Grady's testimony, and will deny that motion as moot.

Second, Plaintiffs have requested further questioning of the District's pandemic coordinator, Dr. Groppe, regarding negotiations between Plaintiffs and the District. This evidence is unnecessary because the District readily acknowledges that it has, thus far, refused to consider any religious exemption. As such, even assuming Dr. Groppe's testimony would show that the District treated Plaintiff's unfairly, the course and details of these negotiations has no bearing on any of the three claims Plaintiffs raise.

## VI.    <u>CONCLUSION</u>

Because Plaintiffs have not shown that they are likely to succeed on the merits of their claims, Plaintiffs are not entitled to the extraordinary remedy of a preliminary injunction. I will therefore deny Plaintiffs' Motion.

An appropriate order follows.